1

2

3

4

5

6

7

            IN THE UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF ARIZONA

8  SEAN PATRICK WARD,                )
                                     )
9          Petitioner,               )
                                     )
10         v.                        )   CIV 07-00606 PCT MHM (MEA)
                                     )
11  DORA SCHRIRO and                 )   REPORT AND RECOMMENDATION
    ARIZONA ATTORNEY GENERAL,        )
12                                   )
           Respondents.             )
13  _____ )

14  TO THE HONORABLE MARY H. MURGUIA:

15         On March 19, 2007, Petitioner, through counsel, filed

16  a petition seeking a writ of habeas corpus pursuant to 28 U.S.C.

17  § 2254.[1]  Respondents filed an Answer to Petition for Writ of

18  Habeas Corpus ("Answer") (Docket No. 13) on September 14, 2007.

19  Petitioner filed a reply (Docket No. 23) to the answer to the

20  petition on December 7, 2007.

21         I Procedural History

22         On or about April 6, 2000, Petitioner was charged by a

23  Mohave County grand jury indictment with the first-degree murder

24  of Ms. Kristine McLaughlin.    See Answer, Exh. A1.    The

25  indictment alleged Petitioner had committed this crime on March

26  _____

27         [1] Petitioner is represented by individual counsel employed
    by the firm of Quarles & Brady, who are acting in a pro bono capacity
28  through the Arizona Justice Project.

26 or March 27 of 2000.  Id., Exh. A1.

Opening arguments in Petitioner's jury trial began February 22, 2001.  Id., Exh. E.  The state asserted in opening argument that Ms. McLaughlin was murdered on the evening of Sunday, March 26, 2000.  Id., Exh. E at 9-10.  The prosecution alleged Petitioner had murdered Ms. McLaughlin because she had ended their romantic relationship and because he was sexually "obsessed" with Ms. McLaughlin.  Id., Exh. E at 4.  The state alleged Petitioner had struck Ms. McLaughlin, then put a rope through a hook in the ceiling and around Ms. McLaughlin's neck, hung her until she was dead, and then cut her down and leaned her body against a laundry basket, and left the house.  Id., Exh. E at 10.  Petitioner's defense counsel maintained in his opening argument that the state would not be able to produce enough evidence to allow the jury to find Petitioner guilty beyond a reasonable doubt.  See id., Exh. E at 24-27.

The evidence introduced at trial included the following:

Ms. McLaughlin and Petitioner met in May of 1999; Petitioner was in the process of a divorce at that time and was not living with his estranged wife.  Answer, Exh. M at 35-36 & 38.  At that time, Petitioner was living with his parents and working as a boat mechanic.  Id., Exh. A, Document 174; Exh. M at 34, 36, 40.  Petitioner and Ms. McLaughlin began living together approximately one month after they met, along with Ms. McLaughlin's children, Bryce, who was four and one-half years old at the time of his mother's death, and Brandon, who was

-2-

three years old at the time of his mother's death. <u>Id.</u>, Exh. F at 37, 52 & Exh. G at 13-16; Exh. M at 4-42.  Prior to meeting Petitioner, Ms. McLaughlin's daughter, Autumn, had died in 1998 at the age of four due to a rare genetic disease.  <u>See id.</u>, Exh. A at Document 174; Exh. F at 36; Exh. M at 83-84.[2]

Petitioner and Ms. McLaughlin and her children lived in Lake Havasu City in a house owned by her mother and step-father, Mr. and Ms. Light, which was a short distance from their own home.  Answer, Exh. G1 at 17.  Mr. and Ms. Light, who both

_____

[2] Bryce was born on September 4, 1995, and Brandon was born on January 7, 1997.  <u>See</u> Answer, Exh. F at 37, 52 & Exh. G at 13-16.  Autumn was presumably born in 1993 or 1994 and died in January or February of 1998 or 1999.  <u>Id.</u>, Exh F at 36 (Officer Koonce's testimony that Autumn died in February of 1999); Exh. L at 7 (Larry Light's testimony that Autumn's birthday was October 12, 1993 and that she started having health problems in January 1997); Exh. M at 83-84 (Petitioner's testimony that Autumn died approximately one and one-half years prior to his meeting Ms. McLaughlin in May of 1999).
Brandon's father is Will Stanley.  <u>See id.</u>, Exh. L at 11.  The record is not clear with regard to who fathered Bryce and Autumn.  <u>See</u> Answer, Exh. E at 43 & Exh. F at 36.  Officer Koonce testified that Mike Kinslow was Bryce's father.  <u>Id.</u>, Exh. F at 36.  Given the rarity and the nature of the disease that caused Autumn and Alana's death, it is likely they both had the same father.  Dianne Light, Timothy Koonce, and Detective Spoerry testified Stacy Johnson was Autumn's father.  <u>Id.</u>, Exh. G at 14; Exh. F at 36; Exh. K1 at 34.  Autumn had the last name of Johnson.  <u>See id.</u>, Exh. F at 35-36.  Elsewhere in the record it appears that Mike Kinslow fathered Autumn and that Mr. Kinslow told the presentence investigator that he had sex with Ms. McLaughlin at about the time her daughter Alana, born in January of 2000, was conceived.  <u>Id.</u>, Exh. A at Document 174.  Ms. McLaughlin married Mike Kinslow in 1995, after Autumn's birth, and they both separately filed for a divorce in February of 1996, after Bryce's birth; it appears the divorce was never granted prior to Ms. McLaughlin's death.  (This information is gleaned from the public record and the undersigned takes judicial notice.)  Ms. McLaughlin took an order of protection against Mr. Johnson in April of 1999, shortly before she met Petitioner at about the time she became pregnant with Alana.  At approximately the same time Mr. Johnson was charged with domestic violence, and in April of 2000 his case was set for trial; however, Mr. Johnson fled and a bench warrant was issued for his arrest in July 2000.  (This information is gleaned from the public record and the undersigned takes judicial notice.)

testified at Petitioner's trial, did not want Ms. McLaughlin to have any other adult living with her in the home.  Id., Exh. G1 at 22 & 95; Exh. L at 9-10.   Testimony was presented that, nonetheless, Ms. McLaughlin had several roommates in the house after she began residing there in February of 1995, some of them unknown to the Lights.  Id., Exh. G1 at 22, 38-39, 94-97; Exh. L at 9-10 & 12.   Both of the Lights also testified they were gone from their residence in Lake Havasu City and had little or no contact with their daughter from June through October of 1999.  Id., Exh. G1 at 20 & 93; Exh. L at 8.

Approximately six or seven weeks after meeting Ms. McLaughlin, in late June of 1999, Petitioner was jailed. Answer, Exh. M3 at 207.  Petitioner served time through October of 1999 pursuant to his guilty plea for assault and criminal damage, which events occurred while he was on probation.[3]  Id., Exh. M at 93.  For several months throughout this time period, until December of 1999 or January of 2000, an individual named Troy Baker lived at Ms. McLaughlin's residence.  See, e.g., id., Exh. L at 58-59 & 173.

On January 15, 2000, approximately eight months after meeting Petitioner, Ms. McLaughlin gave birth to a girl, Alana,

---

[3] Two witnesses inadvertently mentioned in passing during their testimony that Petitioner had been in jail.  Anticipating Petitioner would testify and to avoid a mistrial by avoiding prejudice to Petitioner, the jury was informed, and Petitioner testified, that Petitioner had gone to jail for possession of drug paraphernalia. Answer, Exh. H2 at 158-60 & 162-63, Exh. M at 35.  Petitioner was actually incarcerated because he violated the terms of probation imposed for the paraphernalia conviction by committing assault and causing criminal damage, charges arising from an incident involving Petitioner's father.  Id., Exh. H2 at 158-60 & 162-63.

who died on March 11, 2000, as a result of the same rare genetic disease that caused the death of Ms. McLaughlin's daughter Autumn.[4]  See, e.g., Answer, Exh. G1 at 27-28.

Testimony was presented at Petitioner's trial which was characterized by Respondents as showing Petitioner was jealous and possessive of Ms. McLaughlin during their relationship.  A person who babysat for Ms. McLaughlin testified that Petitioner was extremely possessive of Ms. McLaughlin and that he "kept tabs" on her whereabouts after his release from jail in October of 1999.  See Answer, Exh. H2 at 109-14, 122-23, 126.  The babysitter testified Petitioner once became angry with Ms. McLaughlin because she did not agree to leave Alana with the babysitter overnight.  See id., Exh. H2 at 122-23.  The babysitter also testified Petitioner had told her that he had modified the doorknob of Bryce and Brandon's bedroom door to lock them in the bedroom from the outside.  See id., Exh. H at 121.

Two of Ms. McLaughlin's female friends testified Petitioner had refused Ms. McLaughlin "permission" to see her female friends, that he interrupted and terminated telephone

_____

[4] It is unclear when Ms. McLaughlin and Petitioner became aware, if not immediately, that Alana's death was caused by the same disease that caused Autumn's death.  Alana's paternity was never legally established.  See, e.g., Answer, Exh. E at 28-29.  The extremely rare genetic disease which resulted in the deaths of both Autumn and Alana only affects children who receive the subject gene from each parent.  See id., Exh. E at 29.  See also Encyclopedia Britannica (2007).  Petitioner asserted in his interviews with the police that Alana was his child and that Ms. McLaughlin intended to have his name put on Alana's birth certificate as the baby's father. Answer, Exh. H2 at 181-82.

conversations between Ms. McLaughlin and her friends, and that they left messages for Ms. McLaughlin with Petitioner which messages she did not return or otherwise acknowledge. <u>See</u> Answer, Exh G2 at 197-98; Exh. H at 85.[5]

Testimony was introduced at trial regarding Petitioner's and Ms. McLaughlin's sexual activity. Several witnesses testified Petitioner told them he photographed Ms. McLaughlin in the nude and that he used a video camera to make pornographic videos of himself and Ms. McLaughlin, which videos he and Ms. McLaughlin had discussed selling. Answer, Exh. G at 218-19; Exh. H1 at 88-90; Exh. H2 116-17; Exh. J at 50-58; Exh. L at 97. Testimony was also introduced at the trial that Petitioner had used ropes to bind Ms. McLaughlin's hands during sex. <u>See id.</u>, Exh. G at 194, 204; Exh. H2 at 118-21; Exh. L at 98. A witnesses testified Petitioner had fabricated nooses and also testified Petitioner told them that he used ropes to tie Ms. McLaughlin to a bed during sex. <u>See id.</u>, Exh. G2 at 191-94, 204; Exh. M at 240. Petitioner did not deny these acts during his testimony but testified that he never did anything to hurt Ms. McLaughlin and that she had always been a willing

---

[5] Petitioner's trial counsel presented witnesses, including Petitioner and Ms. McLaughlin's roommate, Troy Baker, Mr. Baker's girlfriend Jeanne Jenkins, and their friend Wendy Fiscella, who all testified Petitioner was more protective of Ms. McLaughlin than jealous or possessive, especially after Alana's death, that the two had a good relationship, and that Petitioner was not jealous of Alana. Answer, Exh. L at 59-61, 177-79, 213, 215, 224, 226-27. Petitioner's counsel discredited Kelly Hopson's and Chris Schweitzer's testimony by, inter alia, soliciting on cross-examination that these witness had used drugs during the time in question. Answer, Exh. G3 at 203 & 211; Exh. H2 at 125.

participant in these activities.   See id., Exh. M at 48-50 & 64-65.

        One end of the rope found noosed around Ms. McLaughlin's neck was attached to one of two hooks in the living room ceiling of her home.   Answer, Exh. DD at Slide 14. Testimony was introduced at Petitioner's trial that Petitioner had installed hooks in the ceiling of the bedroom for use in sexual activities.   Id., Exh. H1 at 91.   Although Petitioner admitted at the trial that he had installed hooks in the bedroom for sexual activity, he testified he had installed the hooks in the living room of the home for a "Johnny Jumper" bouncing device for Alana.   Id., Exh. M at 58-63.   Petitioner testified that, when he installed the hooks in the living room, Ms. McLaughlin, Bryce and Brandon were present, and that Bryce helped him install the hooks.   Id., Exh. M at 64.   Troy Baker testified the hooks in the living room were installed after he moved out of the home in January of 2000.   Id., Exh. L at 101.

        Petitioner's previous ex-wife, Ms. Janet Ward, testified at his trial.[6]   See Answer, Exh. J.   Ms. Ward testified Petitioner had videotaped their sexual acts and that Petitioner used rope to bind her hands and ankles during sex.   Id., Exh. J at 138 & 146.   Ms. Ward testified Petitioner had previously installed a ceiling hook in their bedroom for sexual purposes,

---

[6] Petitioner and Mrs. Ward's divorce, after a thirteen-year marriage, became final in December of 1999 and they remarried in August of 2000.   See Answer, Exh. J at 130-31; Exh. M at 34 & Exh. M2 at 195.   Petitioner and Mrs. Ward have three children together.   Id., Exh. J at 131; Exh. M at 35.

although they never utilized the hook.   See id., Exh. J at 138-39.   Ms. Ward testified Petitioner had never done anything of a sexual nature which she found painful or objectionable. Id., Exh. J at 147-48.   Ms. Ward testified Petitioner had installed hooks in the ceiling of rooms in their homes for the purpose of ceiling lamps, hanging plants, and to install a Johnny Jumper device for their children.   Id., Exh. J at 148-50.

Also introduced as evidence at Petitioner's trial were several drawings made by Petitioner in 1997 depicting nude women with their hands tied, also depicting a rope suspended from above their heads.   See Answer, Exh. M3 at 232-34; Trial Exh. 43.   The police seized the drawings when executing a search warrant on the residence of Tim Ward, Petitioner's brother. Id., Exh. M3 at 234-35.

Ms. McLaughlin's mother, Diane Light, testified she did not know Ms. McLaughlin was pregnant again until October or November of 1999 and that she seldom saw her daughter between November of 1999 and mid-January of 2000.   See Answer, Exh. G1 at 21.  Ms. Light testified that, although she and Mr. Light did not want Ms. McLaughlin living in the house with Petitioner, they did not make an issue of the situation because Petitioner appeared to be taking care of Ms. McLaughlin during her pregnancy.   Id., Exh. G2 at 101.   Ms. Light testified that Ms. McLaughlin was devastated by her baby's death on March 11, 2000. Id., Exh. G1 at 30.   Ms. Light testified that approximately one week after Alana died she began to visit her daughter daily as a result of her daughter's emotional distress.   Id., Exh. G1 at

-8-

28–32 & 106-07.

All of the witnesses who testified at Petitioner's trial with knowledge of the subject stated Ms. McLaughlin had been understandably very depressed in the weeks after Alana's death. See id., Exh. F at 43; Exh. H1 at 103; Exh. L at 25, 68 & 180; Exh. M at 84-85.  These witnesses, including Petitioner and Ms. Light, indicated Ms. McLaughlin's home had not been cleaned and was in a state of considerable disorganization in the days between Alana's death and Ms. McLaughlin's death.  See id., Exh. G1 at 41; Exh. L at 81-87 & 181; Exh. M at 84-85.  The witnesses testified that, in the days after Alana's death and prior to her death, Ms. McLaughlin had been unable to get out of bed on some days and that she appeared distant, vacant, lethargic, or otherwise detached when they interacted with her. See id., Exh. G2 at 105-06; Exh. L at 25; Exh. L at 68; Exh. M at 83-85.  Ms. Light testified her daughter was not eating after Alana's death until the weekend of her own death.  Id., Exh. G1 at 32.

Petitioner testified he and Ms. McLaughlin had an argument on the Wednesday night before her death.  Answer, Exh. M1 at 100 to Exh. M2 at 101.  Petitioner testified Ms. McLaughlin told him on that Wednesday night that she had been unfaithful to him while he was in jail.  See id., Exh. M2 at 146-47; Exh. M3 at 225.  Petitioner testified that he and Ms. McLaughlin had quarreled on Thursday night after he returned home from work that evening, although he stated the quarrel was not serious and did not escalate as had the quarrel on Wednesday

-9-

night.  See id., Exh. M at 103.  Petitioner also testified the couple had been arguing about birth control and about Ms. McLaughlin's mother.  Id., Exh. M at 103-04.

Ms. Light testified that on Friday, March 24, 2000, while Petitioner was at work, she and her daughter spent the afternoon obtaining an application for unemployment benefits and procuring groceries.  See Answer, Exh. G1 at 33-34.  Ms. Light testified that, later on the night of Friday, March 24, 2000, Ms. McLaughlin telephoned her and stated she had ended her relationship with Petitioner.  Id., Exh. G1 at 35, 115, 159-60. Ms. Light went over to her daughter's home after this telephone call and told Ms. McLaughlin she and her sons could move in with the Lights.  See id., Exh. G1 at 35, 37-38.[7]  Ms. Light testified that she and Mr. Light had wanted to sell Ms. McLaughlin's house and that they had told her that if she wanted to continue her relationship with Petitioner, she would have to move out of the house.  Id., Exh. G1 at 38-39.

Ms. Light testified that at 4:45 a.m. on Saturday, March 25, 2000, Ms. McLaughlin telephoned the Lights' residence

---

[7] Mr. Light testified that, after Alana was born, he had wanted both Ms. McLaughlin and Petitioner to move out of the house owned by the Lights because he wanted to sell the house.  Answer, Exh. L at 12.  Mr. Light testified they did not issue Ms. McLaughlin an "ultimatum" or a "deadline" to move out.  Id., Exh. L at 13 ("It was if you guys stay together, find a place to live.").  Petitioner testified that, on the Friday night before her death, he and Ms. McLaughlin planned to move into their own home because the Lights did not want them living together in the home owned by the Lights.  Id., Exh. M at 106-07.  Mr. and Mrs. Light's son-in-law, Officer Koonce, testified that, after Ms. McLaughlin's death, Mr. and Mrs. Light moved to live in their motor home at the Koonces' residence.  Id., Exh. F at 38.

and asked to speak to Mr. Light.  See id., Exh. G1 at 39-40. See also Exh. L at 31.  Mr. Light testified Ms. McLaughlin discussed moving into the Lights' home.  Id., Exh. L at 32.  Ms. McLaughlin, Bryce, and Brandon went over to the Lights' residence on Saturday morning after she called, at about 6 a.m. See id., Exh. L at 32.  Ms. McLaughlin and the two boys showered and ate at the Lights' home on Saturday morning before returning to Ms. McLaughlin's residence.  See id., Exh. G1 at 41.  Mr. Light testified that was the last time he saw Ms. McLaughlin. Id., Exh. L at 32.

Petitioner testified that, before leaving her home on Saturday morning, Ms. McLaughlin awoke Petitioner and told him that their relationship was over and told him the identity of one of her sexual affairs.  Answer, Exh. M2 at 109 & 146.  Ms. McLaughlin told Petitioner to move out of the home that day. See id., Exh. M at 109 & 201-02.  Petitioner testified that, after gathering some work clothes, a camera, and hand tools in a cardboard box, he left Ms. McLaughlin's residence and went to his parents' house.  See id., Exh. M at 109-10.  Petitioner's father testified he did not let his son stay at his home at that time because the father had established a good relationship with Petitioner's then-ex-wife, Janet Ward, in order to see his grandchildren.  Accordingly, Mr. Ward testified, he did not want to engender trouble by having Petitioner at his home when Ms. Ward might be there.  See id., Exh. L at 241-42.

Petitioner then went to the home of his brother, Tim Ward, who agreed Petitioner could stay at his house.  See

-11-

Answer, Exh. G3 at 221, 226; Exh. M at 115-16.  Petitioner told Tim Ward that Ms. McLaughlin had ended their relationship and that she had admitted to multiple sexual affairs.  *See id.*, Exh. G3 at 222-23 & 225-26.  At that time, Tim Ward lived with his girlfriend, Jennifer Gadjos, and their two children.  *See id.*, Exh. G2 at 216; Exh. N at 5-6.

Petitioner testified he went to Ms. McLaughlin's on Saturday night, admittedly uninvited.  Answer, Exh. M2 at 133 & 136.  Petitioner testified he was confused as to why Ms. McLaughlin had ended their relationship and that he wanted to talk to her about her reasons for doing so.  *Id.*, Exh. M2 at 133.[8]  Before going over to Ms. McLaughlin's home, Petitioner left his brother a note stating that he was looking for another place to spend Saturday night.  *See id.*, Exh. G3 at 228-29; Exh. N at 35.[9]  Petitioner testified that, on Saturday night, he went to Ms. McLaughlin's home, that she came outside, that they talked for less than one hour, and that he then returned to his brother's home and spent the night there.  *See id.*, Exh. M at 133-37 & 138-39.  Tim Ward and Jennifer Gadjos testified that

---

[8]Detective Harry testified Petitioner told him in a second interview after Ms. McLaughlin's death that he had gone over to Ms. McLaughlin's house on Saturday night and Ms. McLaughlin told him at that time that her stepfather was the issue.  Answer, Exh. H2 at 186. Tim Ward testified Petitioner thought Ms. McLaughlin's parents were "pushing her" to end her relationship with Petitioner.  *Id.*, Exh. G3 at 225.

[9]Ms. Gadjos testified that, at that time on Saturday night, Tim Ward, Ms. Gadjos, and their children went out twice, once to acquire dinner and once selecting a video.  *See* Answer, Exh. N at 30-31 & 35.  She testified Petitioner left that night for approximately 45 minutes and that he left while they were out the second time.  *Id.*, Exh. N at 31.

-12-

Petitioner spent Saturday night sleeping on their couch.   <u>See</u> <u>id.</u>, Exh. G2 at 226; Exh. N at 35.

On Sunday Petitioner went to Ms. McLaughlin's home. <u>See</u> Answer, Exh. M at 140-41; Exh. M2 at 152.   Petitioner went to the house to move a boat stored there which belonged to a third person, which boat he had agreed to repair for the owner. <u>See</u> <u>id.</u>, Exh. M at 140-41; Exh. M2 at 152.   Petitioner was accompanied on Sunday by a friend, Mr. Campbell.   <u>See</u> <u>id.</u>, Exh. M at 140.   Mr. Campbell and Petitioner both testified that, on Sunday before they went to Ms. McLaughlin's home, Petitioner asked Mr. Campbell if he had been one of Ms. McLaughlin's affairs, that Mr. Campbell said yes, and that Petitioner's response to this information was more hurt or disappointed than angry.   <u>Id.</u>, Exh. I at 166-67; Exh. M at 147-50.

Petitioner, Ms. Light, and Mr. Campbell testified that there was no fight or argument between the Petitioner and Ms. McLaughlin on that date while the others were present.   <u>See</u> <u>id.</u>, Exh. I at 190; Exh. G2 at 128; Exh. M2 at 155-56.   The owner of the boat and his girlfriend were also at Ms. McLaughlin's house on Sunday.   <u>Id.</u>, Exh. I at 134, 138-40.   The boat's owner testified that Petitioner had asked him five or six times on Sunday "did Kristine tell you anything.   What did she tell you." <u>Id.</u>, Exh. I at 141.[10]

---

[10]   The boat's owner also testified that, when he saw Petitioner on Saturday, Petitioner had stated Ms. McLaughlin was "kicking him out and he said that the bitch is going out on me." Answer, Exh. I at 144.   He also testified Ms. Light told him that day that she did not want her daughter to continue her relationship with Petitioner and that she was happy that they were breaking up.   <u>Id.</u>,

1           Ms. Light was at Ms. McLaughlin's home on Sunday
2  helping her daughter clean the home and pack belongings.  See
3  id., Exh. G1 at 45-46.  Ms. Light testified that, on Sunday, her
4  daughter appeared to be feeling better emotionally and that she
5  had eaten and had attended to her appearance.  See id., Exh. G1
6  at 45 & 46.  Ms. Light testified that, on Sunday, Ms. McLaughlin
7  discussed taking Bryce to a pre-school program and that she had
8  discussed seeking a job.  Id., Exh. G1 at 58-59.

9           Ms. Light testified she and her daughter had looked for
10  rope at Ms. McLaughlin's home on Sunday, for the purpose of
11  tying up a box of belongings to donate to charity, and that they
12  could find no rope in the house or garage.  See id., Exh. G1 at
13  56-57.[11]  Ms. Light also testified that, when she remarked upon
14  seeing a video camera in the bedroom, Ms. McLaughlin
15  acknowledged that it was used for pornography, which Ms. Light
16  testified made her "sad."  See id., Exh. G1 at 80, 81-83.

17           Ms. Light testified she left Ms. McLaughlin's home at
18  approximately 4:45 p.m. on Sunday.  See id., Exh. G1 at 46.
19  Upon cross-examination, Ms. Light testified she was not certain
20  as to the time and that she could have left her daughter as late
21  as 5:45 p.m.  See id., Exh. G1 at 54.  Ms. Light testified she

_____

Exh. I at 154.

[11] With regard to the testimony offered by Ms. Light, defense
counsel stated:
      One of the key points that the State has been
      trying to raise is that well, ropes mysteriously
      appear because they weren't there Sunday but
      Dianne Light came back and saw them Wednesday.
      Well, gee, how does that mean Sean did it.
Answer, Exh. K2 at 214.

called her daughter twice that evening, first at approximately "7:00 or 8:00," and then stated that she called the second time at about 8:30 or 9 p.m., and that the calls were not answered. _Id._, Exh. G1 at 62-63.[12]

Petitioner testified that, after leaving Ms. McLaughlin's home on Sunday afternoon, he had a meal and a beer with Mr. Campbell at a local restaurant, and that he then returned to his brother's home, where he watched television and napped on the couch. _See_ Answer, Exh. M2 at 164-65 & 166; Exh. I at 173. Petitioner initially told Detective Harry he called Ms. McLaughlin twice from Tim Ward's home between 5 p.m. and 6 p.m. on Sunday evening. _Id._, Exh. M at 241. Petitioner acquiesced to the record introduced at trial indicating he had called Ms. McLaughlin's residence at 7:06 p.m. on Sunday evening. _Id._, Exh. K at 67; Exh. M at 241-42; Exh. M3 at 242. Petitioner testified Ms. McLaughlin did not answer the phone when he called Sunday evening. _Id._, Exh. M3 at 241-42.[13]

---

[12] Ms. McLaughlin did not have a phone messaging system, but did have a caller ID box. _E.g._, Answer, Exh. K at 59-64. A chart made of the information contained in the caller ID box was presented at trial. _See id._, Exh. K at 60-65. The record from the caller ID box indicated, in addition to the call from Tim Ward's residence, calls presumably from the Lights' residence at 7:50 and 8:42 p.m. on Sunday night. _Id._, Exh. K at 68.

[13] Petitioner testified he talked to Wendy Fiscella for a long time on Sunday night. _See_ Answer, Exh. M2 at 171. Ms. Fiscella's testimony was confused as to whether she talked to Petitioner on Saturday night and no testimony was elicited specifically with regard to whether she spoke with Petitioner on Sunday night. _Id._, Exh. L at 221-22. Mr. Campbell testified Brian, Ms. Fiscella's boyfriend, lived in the house with Ms. McLaughlin before Troy Baker moved in with Ms. McLaughlin while Petitioner was in jail. _Id._, Exh. I at 177-78. Ms. Fiscella testified she and Brian

The undersigned notes that no specific time of death was ever established. A crime scene technician testified Ms. McLaughlin's body was stiff at noon on Monday. Id., Exh. J at 221; Exh. L2 at 143. Dr. Nelson testified that given the status of rigor mortis, i.e., Ms. McLaughlin's body was still in mild rigor, which was starting to wane, and livor, Ms. McLaughlin was likely deceased 12 to 36 hours before he examined her body at 4:30 or 5 p.m. on Monday. Id., Exh. L2 at 131-32. Pursuant to Dr. Nelson's testimony, Ms. McLaughlin could have died as early as 5 a.m. on Sunday or as late as 5 a.m. on Monday.[14] Accordingly, Ms. McLaughlin presumably died after 4:45 or 5:45 p.m. Sunday afternoon, when she was last seen by her mother, and 5 a.m. Monday morning.

Petitioner testified that, after approximately 3 p.m. he did not leave his brother's home on the night of March 26 and early morning of March 27. See Answer, Exh. M2 at 167-68 & 171. Tim Ward testified that, except for two closely proximate trips to a local mini-mart, he was present at his home on Sunday with

lived with Ms. McLaughlin for a short time before Christmas of 1999. See id., Exh. L at 207-08 & 220.

[14] Detective Spoerry testified that he was present at the autopsy performed by Dr. Nelson. See Answer, Exh. K2 at 97-99. Detective Spoerry testified that Dr. Nelson did not administer "any type of examination to determine the time of death or window of death." Id., Exh. K2 at 99. The detective testified that, on the afternoon of the Ms. McLaughlin's death, he "had a window. I probably told the doctor what it was but I didn't see the doctor perform any test to determine what that window was. No." Id., Exh. K2 at 99. Ms. McLaughlin's body was removed from the home by a mortician and not by police. See id., Exh. K1 at 81; Exh. J at 161. Detective Spoerry testified he did not have any personal knowledge as to how the body was maintained after being removed from the home by the funeral home personnel. Id., Exh. K2 at 99-100.

-16-

Petitioner, and his two children, after 4 p.m. See id., Exh. G3 at 231-35, 240-41. Tim Ward testified that on one of the occasions he went to the mini-mart he took one child with him and left the other with Petitioner. See id., Exh. G3 at 237-38 & 239. Petitioner testified Tim Ward made three trips to the mini-mart, one for cigarettes around 5:30 p.m. and two closely proximate trips at about 6:30 p.m. for dinner items. Id., Exh. G3 at 238 & 252. Id., Exh. M2 at 169-70

Testimony was introduced from an employee of the mini-mart that Tim Ward was in the store at least twice on Sunday, first around 3 p.m. and again at 8 p.m. See Answer, Exh. F at 61-62. The employee testified Mr. Ward's son accompanied him the second time. Id., Exh. F at 62. This individual testified that she did not remember seeing Petitioner that evening. Id., Exh. F at 64. A tape taken from the mini-mart video camera indicated Petitioner was at the mini-mart at approximately 4:26 p.m., and that Tim Ward was at the mini-mart at approximately 7:21 and 7:36 p.m. Id., Exh. M at 221 & 223.

Tim Ward's girlfriend, Ms. Gadjos, who was called as a defense witness, testified she worked from 1 p.m. until 10 p.m. on that Sunday. Answer, Exh. N at 24, 28-39. Ms. Gadjos testified that, when she called her home from work that evening to talk to Tim Ward at approximately 6:30 and again at approximately 7:30 or 8 p.m., Petitioner answered the phone. See id., Exh. N at 22-23. Ms. Gadjos testified that Tim Ward was just returning from the mini-mart when she called the second time. Id., Exh. N at 23. Ms. Gadjos also testified that, when

-17-

she came home from work at approximately 10 p.m. on Sunday night, Petitioner was asleep on the couch and that he remained there until she went to bed at 10:45 p.m. See id., Exh. N at 24-25. She also testified that Petitioner was on the couch, apparently asleep, at approximately 4 a.m., when she got up to turn down the heat. See id., Exh. N at 26. Ms. Gadjos and Tim Ward testified that Petitioner appeared "normal" early on Monday morning, that he was on the couch at 6:30 a.m., had coffee with Mr. Ward at about 7 a.m., and went to work at approximately 7:45 a.m. See id., Exh. G3 at 260-62; Exh. N at 27-28.

The prosecution argued that Petitioner's car, a Ford Pinto, was available for him to make the approximately 30-minute round-trip to Ms. McLaughlin's house on the night of her death. See id., Exh. I at 171-72, 191, 194; Exh. J at 38-39; Exh. K at 51-52. Petitioner's brother Tim Ward testified that, on that Sunday, his vehicle did not have any gas in it and that it was, therefore, inoperable. See id., Exh. G3 at 237, 243, 250. Accordingly Tim Ward testified he had used Petitioner's Ford Pinto to go to the grocery store on both occasions on Sunday evening. See id., Exh. G2 at 237, 243, 250. Testimony was also introduced that on Sunday Petitioner had drained gas from a boat motor, i.e., the boat removed from Ms. McLaughlin's garage, to put in the Ford Pinto. Id., Exh. I at 171-72; Exh. M2 at 358-59.

One of Tim Ward's neighbors testified that she was up on Sunday night at approximately 1:30 or 2 a.m. and again Monday morning at 4 or 4:30 a.m. tending to an infant and a puppy. See

-18-

Answer, Exh. L at 165 & 168.  This witness testified she saw Petitioner's car outside Tim Ward's residence on each occasion when she was up and that she did not observe anyone coming or going from the residence.  See id., Exh. L at 165-66 & 168-69. A neighbor of Ms. McLaughlin's testified that she walked past Ms. McLaughlin's house between 5 and 6 p.m. on Sunday and that she did not see anything unusual and that there were no cars parked outside the residence at that time.  See id., Exh. E at 31.  Detective Harry testified that he had "canvas[sed]" both Tim Ward's neighborhood and Ms. McLaughlin's neighborhood to determine if anyone had seen anything but that he did not get "useful information" from this endeavor.  Id., Exh. H3 at 213-14.

Ms. McLaughlin's body was discovered by her brother-in-law on March 27, 2000, a Monday, at approximately 8 a.m.[15]  Ms. McLaughlin's brother-in-law, a Fort Mohave Tribal Police Officer, Tim Koonce, drove by her house that morning and saw Bryce and Brandon playing outside the house without supervision. See Answer, Exh. F at 19.[16]  Officer Koonce stopped his patrol

_____

[15] Officer and Mrs. Koonce were separated at the time he testified at Petitioner's trial.  See Answer, Exh. F at 7.  Bryce and Brandon went to live with Officer and Mrs. Koonce immediately after their mother's death.  Id., Exh. F at 29 & 48.

[16] Bryce and Brandon were presumably dressed in street clothes, rather than pajamas, when Officer Koonce saw them on Monday morning.  The trial testimony from Ms. Light, Mr. Light, and Officer Koonce is silent as to this point, however, these individuals do not mention dressing Bryce and Brandon prior to putting them in Officer Koonce's cruiser, or prior to their being taken for a forensic interview, and Bryce is seen in street clothes in the video-tape of the interview.

car and asked his nephews where their mother was. <u>Id.</u>, Exh. F at 20. Officer Koonce testified that Bryce's response, "Mommy died," prompted him to investigate. <u>Id.</u>, Exh. F at 20. He testified that, upon entering the home, he found Ms. McLaughlin's body "sitting on the ground" in the living room, slumped forward on her knees and elbows. <u>Id.</u>, Exh. F at 22-23. Officer Koonce testified "I seen lividity..." <u>Id.</u>, Exh. F at 22.

Officer Koonce testified he immediately noticed a rope around Ms. McLaughlin's neck, as well as a length of rope hanging from one of two hooks in the living room ceiling. <u>Id.</u>, Exh. F at 22-23. The prosecution presented evidence from a forensic expert that the rope had been cut. <u>Id.</u>, Exh. H1 at 13-14. Petitioner's counsel brought a motion in limine to exclude the introduction of the forensic expert's conclusion the rope had been cut. <u>Id.</u>, Exh. H at 4-6.

The Mohave County Medical Examiner, Dr. Nelson, examined Ms. McLaughlin's body on March 27, 2000, the same day that she was found dead, at approximately 4:30 or 5:00 p.m. Answer, Exh. K2 at 97; Exh. L2 at 131. During his autopsy, Dr. Nelson completely dissected Ms. McLaughlin's neck and removed the upper two vertebrae. <u>Id.</u>, Exh. L2 at 136.[17]   Dr. Nelson

---

[17] In his petition for habeas relief Petitioner asserts that, during Dr. Nelson's pre-trial interview with defense counsel, Dr. Nelson told Petitioner's trial counsel that neither of the vertebrae were broken. <u>See</u> Petition at 16. Dr. Nelson also X-rayed Ms. McLaughlin's neck and found no fractures. <u>Id.</u> The autopsy indicated the hyoid bone was unbroken. <u>Id.</u> This evidence was not introduced via Dr. Nelson's or Dr. Keen's testimony at Petitioner's trial, which Petitioner asserts supports his contention that his trial counsel was

testified he had determined that the cause of death was by asphyxiation.   <u>Id.</u>, Exh. L2 at 124 & 137.   However, he could not conclude whether the manner of death was homicide, suicide, or accident. <u>Id.</u>, Exh. L2 at 125 & 137-38 (Dr. Nelson testified the evidence was "not inconsistent with suicidal hanging but [] not inconsistent with other scenarios").   Dr. Nelson further testified that there was a blood clot in Ms. McLaughlin's left nostril and that blood came out of her nose at about the time of her death.   <u>Id.</u>, Exh. L2 at 141.

Detective Spoerry was present at the autopsy performed by Dr. Nelson.   <u>Id.</u>, Exh. K2 at 97.   Dr. Nelson indicated to Detective Spoerry at the time of the autopsy that he could not conclude that the manner of death was homicide because of the condition of Ms. McLaughlin's neck.   <u>Id.</u>, Exh. K2 at 103.

Dr. Nelson testified:

> We did an anterior neck incision and found very little trauma to the soft tissue of the neck. I took some skin incisions over the area of the ligature and again they showed minimal what are called cellular abrasions to the red cells within the soft tissue of the neck.

<u>Id.</u>, Exh. L2 at 116-17.

---

unconstitutionally ineffective.
   The hyoid bone (lingual bone) is a bone in the neck at approximately the junction of one's chin and throat.   It is supported by the muscles of the neck and in turn supports the root of the tongue.   It is the only bone in the human skeleton not articulated to any other bone and, due to its position, the hyoid bone is not usually easy to fracture.   In cases of suspicious death, a fractured hyoid is a strong sign of strangulation.   <u>See</u>, <u>e.g.</u>, Webster's New World Medical Dictionary, 3d ed. 2008.

1    The police were not satisfied with Dr. Nelson's
2 findings. Answer, Exh. K2 at 102-103. The police sent Ms.
3 McLaughlin's body, without the neck tissue or the hyoid bone, to
4 Maricopa County's Chief Medical Examiner, Dr. Keen, for the
5 purpose of doing a second autopsy. Dr. Keen conducted the
6 second autopsy three days after Ms. McLaughlin's death, on the
7 30th. See id., Exh. K2 at 86, 103-04.

8    At trial, Dr. Keen allowed that he had not examined
9 "the soft tissues of the neck, which would include the voice
10 box, the larynx, the hyoid bone, thyroid cartilage, esophagus
11 and trachea." Answer, Exh. I at 89, 103. Dr. Keen testified at
12 trial he had concluded that the manner of death was homicide,
13 based on what he characterized as various "defensive" bruises on
14 the body, including two bruises to Ms. McLaughlin's "left
15 frontal scalp visible only on the deep surface of the scalp
16 reflecting it." Id., Exh. I at 95 (peeling back the skin from
17 her skull and looking at the underside). He opined that the
18 effect of the two bruises "could be anything from just the wince
19 from the discomfort of being struck to even loss of
20 consciousness," or that the effect "could" stun somebody. Id.,
21 Exh. I at 99.

22    When asked at Petitioner's trial about Dr. Keen's
23 findings, Dr. Nelson testified he had spoken with Dr. Keen after
24 reviewing his autopsy results. Dr. Nelson testified that, after
25 becoming aware that Dr. Keen had concluded that Ms. McLaughlin's
26 death was a homicide, Dr. Nelson again reviewed the body to
27 satisfy himself that his own conclusion was correct. Id., Exh.

28                              -22-

L2 at 126-27 & 135.   He also reviewed Dr. Keen's report, but after a review of both the body and Dr. Keen's report, Dr. Nelson did not find any reason to change his opinion regarding the manner of death.   Id., Exh. L2 at 127.   Dr. Nelson opined that the bruises which Dr. Keen testified could have made Ms. McLaughlin "compliant" were actually livor, the discoloration of the body after death.   Id., Exh. L2 at 127 & 135.   Dr. Nelson opined this conclusion was consistent with the description of Ms. McLaughlin's body position when she was found, i.e., with her forehead touching the floor.   Id., Exh. L2 at 127 & 135.[18]

After receiving the conflicting reports from Dr. Nelson and Dr. Keen, Petitioner's trial counsel, Mr. Engan, contacted Dr. Peters, the Pima County Chief Deputy Medical Examiner. Answer, Exh. Y at 14.   Dr. Peters told Petitioner's trial counsel that a third examination of the body would not likely reveal any new information.   Id., Exh. Y at 14.[19]

After ascertaining that Ms. McLaughlin was deceased, Deputy Koonce placed his nephews inside his patrol car, with his own son who had been in the car, and called 911.   See Answer, Exh. F at 23-24.   Deputy Koonce testified that, at the time, he did not know if Ms. McLaughlin's death was a suicide, murder, or accident, and that he was "really shook up."   Id., Exh. F at 27-

_____

[18] Officer Koonce testified that he observed livor at the time he discovered Ms. McLaughlin's body, see Answer, Exh. F at 22, and the crime scene photographs indicate Ms. McLaughlin's blood had pooled in her lower arms and legs at the time the photos were taken at about noon on Monday.   Id., Exh. AA.

[19] Ms. McLaughlin's body was released by the state trial court on August 15, 2000.   See Answer, Exh. D at 21-22.

28.  Deputy Koonce also testified that, after calling the police and while waiting for officers to arrive, he called Mr. and Mrs. Light to inform them of their daughter's death.  Id., Exh. F at 24.

After the police had arrived at Ms. McLaughlin's residence, at the request of Detective Wolf, Deputy Koonce drove Bryce and Brandon to meet a child therapist, Dr. Goldstein. Id., Exh. F at 27– 28.  Deputy Koonce testified he said nothing about their mother's death to his nephews during the ride.  Id., Exh. F at 28.

Dr. Goldstein, a child therapist and forensic interviewer, testified at Petitioner's trial.  Answer, Exh. H. Dr. Goldstein's interviews with Bryce and Brandon the morning of their mother's death were video-taped and the jury was shown the videotape of Dr. Goldstein's interviews with each boy.[20]  Id., Exh. H at 41, 43, 45, 46-47.  Dr. Goldstein testified that, before she interviewed Bryce and Brandon, she spoke to Detective Wolf.  Id., Exh. H at 35–39; Exh. J at 85–87. Detective Wolf advised Dr. Goldstein that Ms. McLaughlin's death appeared to be a suicide.  Id., Exh. H at 39.  Neither Detective Wolf nor Deputy Koonce told Dr. Goldstein that Ms. McLaughlin's death involved the use of rope.  Id., Exh. J at 36, 39-40; Exh. J at

_____

[20]Brandon did not testify at trial.  Dr. Goldstein testified that, when she asked Brandon if "daddy" was home last night, Brandon answered no.  See Answer, Exh. H at 47-48 & 61.  He also told her that "daddy mad."  Id., Exh. H at 62.  Brandon never mentioned Petitioner by name during his interview with Dr. Goldstein.  Id., Exh. H at 72-73.  At one point when asked who "did that" to his mother, Brandon says "Mimi," the term her grandchildren used to refer to Ms. Light. Id., Exh. H at 72.

86-87.   Although the detective told Dr. Goldstein the names of Petitioner and Ms. McLaughlin and her sons, no one informed Dr. Goldstein that the boys called Petitioner "Daddy".   Id., Exh. H at 39; Exh. J at 86.

Dr. Goldstein testified at trial that Bryce told Dr. Goldstein that Petitioner had been at his house the previous night, and that his mother had been sad.   Id., Exh. H at 55-56; Exh. EE at Trial Exh. 5.   During the taped interview, when Dr. Goldstein asks Bryce for his daddy's name, Bryce stated Petitioner's first name.   Id., Exh. H at 55-56; Exh. EE at Trial Exh. 5.

At Petitioner's trial, several witnesses testified that Bryce called more than one adult male "daddy."   See Answer, Exh. I at 178-79; Exh. L at 66-67, 175, 211.   Troy Baker testified that he had tried to get Bryce to stop this habit, and that he had succeeded only in getting Bryce to call him "daddy Troy." Id., Exh. L at 64-65.

Dr. Goldstein testified that Bryce had a speech impediment and below average verbal skills for a boy his age. See Answer, Exh. H at 42.   Dr. Goldstein testified that she did not hear or understand some of Bryce's responses during the interview and that at times Bryce was non-responsive.   Id., Exh. H at 51-52, 56.   Several family members and friends of Petitioner and Ms. McLaughlin testified that Bryce's speech was at times difficult to understand.   Id., Exh. G at 58; Exh. L at 16, 63, 174.

-25-

Ms. McLaughlin was fully clothed, including a brassiere, at the time the crime scene photographs were taken. See Answer, Exh. K1 at 22; Exh. DD. A sexual assault kit was performed on Ms. McLaughlin, but no evidence of semen was found. See Answer, Exh. K1 at 22 & Exh. K2 at 154. A small amount of blood was found on her shorts and samples containing both blood and "some tissue" were found on fingernail clippings. Id., Exh. K 2 at 154-59. A forensic pathologist testified that DNA analysis indicated that the blood and tissue was Ms. McLaughlin's. Id., Exh. K2 at 157 & 159.[21]

Detective Spoerry testified as to crime scene photographs on the seventh day of Petitioner's trial. Answer, Exh. K1.[22] Detective Spoerry testified that a rope was found just inside Ms. McLaughlin's bedroom on the floor and a noosed rope was found on a bureau in the dining area of the home. Id., Exh. K1 at 9-10. The jury was told that pornographic videotapes were found in the bedroom. Id., Exh. K at 10. Detective Spoerry testified that photos of the deceased Ms. McLaughlin taken at the site of her death showed lividity. Id., Exh. K1 at 11-12. Detective Spoerry testified that Ms. McLaughlin was

---

[21] The scene was changed from a possible suicide to a crime scene and the investigators and technicians ordered out of the house by their superiors until they could get a search warrant at approximately 9 or 10 a.m., based on Bryce's statements to Dr. Goldstein. Answer, Exh. J at 224.

[22] Detective Spoerry had previously investigated five homicides in his 17 years with the Lake Havasu City Police Department. Answer, Exh. K1 at 72. Detective Spoerry was given Petitioner's name as someone who lived in the house by Larry Light, Ms. McLaughlin's stepfather, when Mr. Light arrived at Ms. McLaughlin's residence on the morning of her death. Id., Exh. K1 at 77.

fully clothed when she was found and that there were no signs of torn clothing "or anything like that." <u>Id.</u>, Exh. K1 at 22. Detective Spoerry testified that there were laundry baskets and piles of folded clothing in the living area, but "you would be correct saying everything else was strewn about in the house," although he testified there was no sign of a struggle. <u>Id.</u>, Exh. K1 at 79-81. Detective Spoerry testified he found one "larger [knife] lying on the floor of Ms. McLaughlin's bedroom" and one in a box in the bedroom. <u>Id.</u>, Exh. K1 at 85 & 88.

Petitioner was brought into police headquarters and interviewed by Detective Harry in the early afternoon of March 27, 2000, the day Ms. McLaughlin was discovered, before the first autopsy was performed. Answer, Exh. H2 at 147. Petitioner was Mirandized prior to the interview and the interview was video-taped. <u>Id.</u>, Exh. H2 at 149-51. A portion of the videotape was played at Petitioner's trial. <u>Id.</u>, Exh. H2 at 166; Trial Exh. 6. The video recording of this interview was introduced into evidence, but the jury was not allowed to bring the videotape into the jury room for deliberations. <u>Id.</u>, Exh. H2 at 154.

Detective Harry testified that Petitioner told him on Monday that, on Sunday night, Tim Ward had been test-driving a vehicle with Mr. Gadjos, Jennifer's father. <u>Id.</u>, Exh. H2 at 177. Petitioner told Detective Harry that, on Sunday night, he had left Tim's house once to go to the mini-mart. <u>Id.</u>, Exh. H at 177. When questioned about the hooks in the living room ceiling of Ms. McLaughlin's home on that date, Petitioner stated

he had put the hooks in the ceiling.  Id., Exh. H2 at 220. During the interview Petitioner professed his love for Ms. McLaughlin.  Id., Exh. H2 at 174.  Petitioner was not arrested at that time.

The next day, on March 28, 2000, Dr. Tascha Boychuk-Spears conducted a second videotaped interview with Bryce.  Answer, Exh. K1 at 24-25  Detective Spoerry testified he personally took Bryce to Mesa to see Dr. Boychuk-Spears because she was "one of the best known forensic interviewers that I am aware of."  Id., Exh. K1 at 24.[23]  Mr. and Mrs. Light also accompanied the detective and Bryce to see Dr. Boychuk-Spears. Id., Exh. K1 at 25.  The videotaped interview was shown to the jury at Petitioner's trial and Dr. Boychuk-Spears testified at Petitioner's trial regarding the interview.  See Answer, Exh. K1.

Prior to the interview, Dr. Boychuk-Spears reviewed Bryce's interview with Dr. Goldstein.  Id., Exh. K1 at 26-27. Dr. Boychuk-Spears testified at trial that Bryce had a speech problem and that he was difficult to understand at times.  Id., Exh. K1 at 20, 60.  Dr. Boychuk-Spears testified that, during the interview, Bryce drew a picture and said daddy put a rope around his mother's neck.  Id., Exh. K1 at 28-30.  The doctor testified Bryce also said "daddy had put mom on a hook."  Id.

---

[23] Detective Spoerry testified it was his "Sergeant supervisor's decision" to conduct the Boychuk-Spears interview. Answer, Exh. D at 41-42.

At Petitioner's trial, Dr. Boychuk-Spears admitted asking Bryce leading questions and repeating over fifteen times during the interview a phrase approximating "daddy putting the rope around mommy's neck." <u>Id.</u>, Exh. I at 57. She also testified that, when she asked Bryce if "Sean" was his daddy, he said "no." <u>Id.</u>, Exh. I at 57. She testified he said that "he put the rope on mom neck and went back to work." <u>Id.</u>, Exh. I at 6. Bryce also told Dr. Boychuk-Spears that Brandon cut the rope with a knife or scissors and then his mother fell. <u>Id.</u>, Exh. I at 204.[24]

Petitioner was again interviewed by Detective Harry on March 31, 2000. <u>See</u> Answer, Exh. H2 at 196-97. At that time, the detective played the taped interview of Dr. Boychuk-Spears and Bryce, inculpating Petitioner in Ms. McLaughlin's death. <u>Id.</u>, Exh. H2 at 196-97. Petitioner told Detective Harry that not knowing why Ms. McLaughlin had ended their relationship had made him "insane." <u>Id.</u>, Exh. M at 188.

Petitioner was arrested the next day, on April 1, 2000, for the murder of Ms. McLaughlin, and released pending trial on his own recognizance on July 3, 2000. Answer, Exh. A at Document 174. Petitioner was represented by appointed counsel for approximately six weeks, and then he retained private counsel, Mr. Engan, in mid or late May of 2000. <u>Id.</u>, Exh. M at 120. Petitioner's appointed counsel, Mr. Weiss, had the

---

[24] At trial the defense presented the testimony of an expert pointing out the flaws in the techniques used by Dr. Goldstein and Ms. Boychuk-Spears when interviewing Bryce. <u>See</u> Answer, Exh. N1 at 8-94.

assistance of an investigator who was employed by the Mohave County Public Defense office. _Id._, Exh. M at 13-17. The investigator accompanied appointed counsel to Ms. McLaughlin's residence on April 20, 2000. _See id._, Exh. M at 13-17. The investigator testified at Petitioner's trial only as to the locks on the interior doors of Ms. McLaughlin's residence shortly after her death. _Id._, Exh. M at 13-17.

After Petitioner's arrest, on April 20, 2000, Detective Spoerry conducted a third interview of Bryce, this time at the police station. Answer, Exh. K1 at 31.[25] At trial, Detective Spoerry told the jury that he had the capacity to video-tape the interview with Bryce on April 20, but that he had not taped the interview. _Id._, Exh. K1 at 39-40 & 45-46. Detective Spoerry testified he had asked for the prosecutor's opinion on this matter prior to deciding not to tape the interview with Bryce. _Id._, Exh. K1 at 46.

At Petitioner's trial, Detective Spoerry testified that the photo lineup he had shown Bryce on April 20, 2000, included both a picture of Petitioner and a picture of "one of Kristine's ex-boyfriends [Stacy Johnson]." _Id._, Exh. K1 at 34 & 38. Detective Spoerry testified that Bryce pointed to the photograph

---

[25] Detective Spoerry testified at a pretrial hearing on August 15, 2000, that when he had a videocamera set up in his office and he "asked Mr. Smith [the district attorney] if I should videotape the interview," and "He said 'I wouldn't.' He gave his opinion stating the fact he would not tape him." Answer, Exh. D at 47.

of Petitioner and said "daddy."  <u>Id.</u>, Exh. K1 at 42.[26]

The detective testified that the distance between Tim Ward's and Ms. McLaughlin's house was about 10 miles and that it took about 14 to 16 minutes to drive from one residence to the other.  Answer, Exh. K1 at 51-52.  The detective testified that the caller ID box taken from Ms. McLaughlin's home indicated a phone call from Tim Ward's home at 7:06 p.m. on the relevant Sunday evening.  <u>Id.</u>, Exh. K1 at 67.  The caller ID box also indicated a call to Ms. McLaughlin's residence from a different location at 7:49 p.m. that Sunday evening.  <u>Id.</u>, Exh. K1 at 67. The caller ID box also indicated calls to Ms. McLaughlin's residence from a private number at 7:50 and 8:42 p.m. that Sunday evening, presumably made from the Lights' residence. <u>Id.</u>, Exh. K1 at 68.  The caller ID box also indicated calls to Ms. McLaughlin's residence on Monday morning from a private number at 7:15 and 7:16 a.m.  <u>Id.</u>, Exh. K1 at 68.  Detective Spoerry also testified about nude pictures of Ms. McLaughlin

---

[26] Prior to trial, the trial court stated:
I don't wish to make this sound as if nothing of what you all do matters but I am sure it is not going to come as a surprise to you that I have pretty much made a decision as to what I think the law in this area is and will tell you that if you were able to establish that the Detective made the inconsistent statements that you are attributing to him, it is not going to make any difference to my decision.
Answer, Exh. D at 58-59.
The trial court, after hearing argument during this pre-trial hearing, denied defense counsel's motion to dismiss based on the bad faith of the prosecution in not preserving exculpatory evidence, stating that it could not be error for failing to make a tape of an interview, i.e., Detective Spoerry's interview with Bryce.  Answer, Exh. D at 64-68.

-31-

found at her home, showing her engaged in sex with an unidentified male, including a picture of her tied up spread-eagled to a bed. Id., Exh. K1 at 71-72.

Bryce was the last witness for the prosecution.[27]  He testified that Brandon was his cousin and his brother, and that he was five years old. Answer, Exh. K2 at 169-70.  Bryce correctly identified coins and family members, and stated that he knew the difference between boys and girls. Id., Exh. K2 at 172-75.  Bryce testified his mother was in heaven. Id., Exh. K2 at 177.

In response to the question, "What happened to your mom," Bryce stated: "Her had a neck in rope and hook on up a wall." Id., Exh. K2 at 178.  Bryce testified:

> Q: Okay, what happened to [your mother's] neck?

---

[27]Petitioner's counsel brought a pre-trial motion to preclude Bryce's testimony, arguing that he was not a competent witness.  Bryce was interviewed by the state trial judge in the courtroom at a hearing on that motion August 15, 2000. See Answer, Exh. D.  Only the judge was allowed to question Bryce at the pretrial hearing. Id., Exh. D. Petitioner was not present in the courtroom for the hearing but was allowed to listen to the hearing through teleconferencing. Id., Exh. D.  The transcript reveals Bryce was somewhat incoherent at least to the court reporter. Id., Exh. D.  Bryce did know his colors, day from night, a real duck from a toy duck, and the sounds animals make. Id., Exh. D.  After questioning was completed and Bryce was excused, neither counsel had additional questions they wanted the judge to ask Bryce. Id., Exh. D.  After hearing arguments, the trial judge concluded that, following state law precedent, to find Bryce incompetent to testify, he would have to find "no trier of fact could reasonably believe the prospective witness could have observed, communicated, remembered or told the truth with respect to the event in question." Id., Exh. D at 20.  He then stated:  "I certainly wouldn't relish being a prosecutor knowing that Bryce would be my star witness." Id., Exh. D at 20.  The trial court ruled that Bryce was competent, stating: "it is going to be up to the jury to decide what significance or what weight or credibility to attach to his testimony." Id. at 20-21.

-32-

```
A: Blood fall down her nose.
Q: What color was the blood?
A: Red.
. . .
Q: Can you tell us what happened to mommy's
neck?
A: Sean he tied rope up.
Q: He tied the rope up?
A: Yes.
. . .
Q: When he was doing this, was Sean happy or
mad?
A: He mad.
Q: Okay, where did he put the rope?
A: On her neck.
. . .
```
Answer, Exh. K at 178-79.

Bryce testified that Brandon was in their bedroom playing when this occurred, and that he came out of his room because he wanted a drink of juice. Answer, Exh. K3 at 180. During his testimony at trial, the prosecutor had Bryce "draw a picture of your mommy like she was the night you saw something happen to her." Id., Exh. K3 at 180. Bryce indicated a rope around his mother's neck and said Sean put the rope there and then put the rope on a hook on the wall. Id., Exh. K3 at 181-82 & Exh. B (Photocopies of Trial Exhibits, Exh. 8). Bryce testified that after Sean put the rope around his mother's neck, Sean "[G]o to work." Id., Exh. K3 at 182-83. Bryce repeated the "go to work" phrase three times. Id., Exh. K3 at 182-83. Bryce also testified that he tried to "save" his mother, and that he was able to wake her up. Id., Exh. K3 at 184. He then testified that she did not ever wake up. Id., Exh. K3 at 184.

On cross-examination, in response to the question "When did you ever come to court before," Bryce responded "I saw mom. I already open the door and I saw her." Answer, Exh. K3 at 185.

1
2
3
4

Bryce also stated he had met "Matt" five times, and Matt had shown him pictures and "taught me." Id., Exh. K3 at 197. Bryce further stated he had two daddies, one named Stacy and one named Sean. Id., Exh. K3 at 201.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

In response to defense counsel's question regarding how his mother got "down from the hook," Bryce initially responded: "Nothing." Answer, Exh. K3 at 201. He then stated: "I said nothing. I can't see because -- because I can see mom and the hook. I want see my crayons because got to work." Id., Exh. K3 at 201. He then elaborated: "I said -- I said I already hold the crayons and you hold the toy. The toy can't do anything either." Id., Exh. K3 at 202. Upon further questioning about how his mother "got down," Bryce responded: "Said nothing get down. I saw nothing. Sean already put hook on the neck and Brandon already sawed it so I -- and then we hold the toy knife." Id., Exh. K3 at 202. Bryce stated that Brandon "cut the rope" with a "big pink knife. Sharp." Id., Exh. K3 at 203-04. Bryce then also testified that Brandon "cut with the -- on this and cut it and my mom fall." Id., Exh. K3 at 204.

20
21
22
23
24

During the cross-examination of Bryce, the judge interrupted the proceedings to admonish the jury to resist the "temptation" to "confer and for you to indicate what you think [Bryce] is saying. Please do not do that." Id., Exh. K3 at 193.

25
26
27

At the close of Bryce's testimony, the prosecution rested and defense counsel moved for a directed verdict. Id., Exh. K2 at 212. Petitioner's counsel noted Bryce was easily led

28

-34-

and that Bryce had been "coached by the State to give certain
responses." Id., Exh. K2 at 213.  Counsel argued that "no
reasonable jury on the basis of the evidence which has been
submitted could find my client guilty." Id., Exh. K2 at 213.
The trial court concluded that Bryce's testimony, "if believed
by the jury[,] is sufficient probably to convict the Defendant
of at least something in this case." Id., Exh. K2 at 216.  The
trial court denied the motion because it determined there was
sufficient evidence presented to enable reasonable jurors to
conclude the defendant acted with premeditation to cause Ms.
McLaughlin's death.  Id., Exh. K2 at 218.

Outside the presence of the jury, the trial court
further stated:

> I am wondering whether there isn't the
> argument that could be made that this
> happened in the morning and this is why I was
> interested in evidence that we never heard.
> That's any estimate regarding the time of
> death. ...
> That was a question about whether the boys
> were in pajamas or were dressed and I thought
> to myself, these are kids at an age that
> probably don't dress themselves and would
> have to be dressed by an adult person and I
> found myself wondering whether there is
> necessarily any accounting for where the
> Defendant is after he leaves and goes to work
> ... and the time that Tim Koonce came by.  I
> have the impression that this is maybe
> inconsistent with the testimony about
> lividity. ...

Answer, Exh. K2 at 217.  The trial court then stated that the
physical evidence did not support the theory that Ms. McLaughlin
had committed suicide.  Id., Exh. K at 218.

-35-

1    The last day of testimony was March 9, 2001.  <u>See</u> <u>id.</u>,
2 Exh.  N.   Closing  arguments  were  presented  to  the  jury  on
3 Thursday, March 15, 2001.  <u>See</u> <u>id.</u>, Exh. P1.  The state argued:

> He had been there the night before without
> being invited and he went back there again on
> Sunday and when he went over there, he went
> over with bad intentions.  He was angry.
> They had been fighting since the baby had
> died.  He had this anger amplified by the
> fact Thursday night he found out that she had
> cheated on him while he was away.

Exh. P2 at 3.  The prosecution alleged Petitioner struck Ms.
McLaughlin "multiple times." <u>Id.</u>, Exh. P2 at 3.  The prosecutor
continued:

> Then he got a rope. A rope that he had put
> together. *A rope that he knew exactly where
> it was in that house.* He put one end of that
> rope around her neck and the other end around
> a hook hanging from the ceiling in the living
> room. A hook that he had himself installed
> for their sex games. A hook that he had
> himself put ropes on in the past. After he
> strangled her with that rope, he left her to
> hang in her own living room. He left her
> there in her living room with her two little
> boys [] to spend the night with their dead
> mother.
> Then he leaves and goes back to his brother's
> house to make a rather poor attempt at
> establishing an alibi in this case. You have
> seen the problems with that.

<u>Id.</u>, Exh. P1 at 3 (emphasis added).

Petitioner's counsel argued to the jury, *inter alia*,
that the police had rushed to the conclusion that Petitioner
caused Ms. McLaughlin's death and that they failed to properly
investigate her death.  <u>Id.</u>, Exh. P1 at 6.  Counsel asserted the
state had introduced irrelevant facts and testimony to prejudice
the jury against his client.  <u>Id.</u>, Exh. P1 at 6-7.  Counsel

-36-

emphasized that the only person who had allegedly seen Petitioner at the crime scene during the relevant time period was Bryce, who's testimony could not be relied upon to establish guilt beyond a reasonable doubt. Id., Exh. P1 at 23-24. Counsel reminded the jury there was no DNA evidence establishing Petitioner had harmed or killed Ms. McLaughlin. Id., Exh. P1 at 24. Counsel also noted the testimony of the defense expert who opined that Ms. McLaughlin's seemingly brighter demeanor on the day of her death could have indicated she had decided to commit suicide. Id., Exh. P1 at 27.[28] Counsel also argued as discussed more fully, infra.

On rebuttal, the state argued:

> State's Exhibit Number 15 shows that there was a call at 7:06 p.m. so that works two ways. Either he killed her right before then he got back home and called to help establish his alibi that night or he called at 7:06 p.m. She didn't answer the phone and he is mad. What is she up to. Who is she with. Is there somebody else that she is cheating on me again. He goes over there at that time...

Id., Exh. P1 at 69. Defense counsel noted the jury heard testimony Bryce and Brandon were in street clothes on Monday

---

[28] One of the defense theories was that Mr. Light might have committed the crime. Troy Baker testified he went to the Lights' residence several days after Ms. McLaughlin died to express condolences and that, at that time, Mr. Light told him the last time he had seen Ms. McLaughlin was Sunday and that they had argued. Answer, Exh. L at 80-81. Mr. Light denied making this statement. Id., Exh. L at 20 & 37. Petitioner's father and sister testified that Mr. Light had stated in a telephone conversation with Mr. Ward, overheard by Ms. Ward, that the last time he had seen Ms. McLaughlin they had quarreled. Id., Exh. L at 245-46; Exh. M at 26-27. Mr. Light denied making this statement. Id., Exh. L at 20-21.

-37-

1
2
3
4

morning and argued that fact and the fact that Ms. McLaughlin did not answer the phone when her mother called after 7:30 p.m. on Sunday night indicated she was killed before that time.  Id., Exh. P1 at 70.

5
6
7
8
9
10
11
12
13
14

        After closing arguments, on Thursday, March 15, the jury was instructed on first-degree premeditated murder, and second-degree murder and manslaughter.  Id., Exh. O at 4-8. Defense counsel objected to the inclusion of an instruction on the lesser offenses as not being supported by the evidence. Id., Exh. N at 106-18.  The jury deliberated for four or five hours that afternoon.  Id., Exh. O at 14 & 23-25.  The next morning, Friday, March 16, 2001, the jury returned a verdict of guilt on the offense of second degree murder.  Id., Exh. A at Document 168.

15
16
17

        On April 13, 2001, after a hearing, Petitioner was sentenced to a term of 22 years imprisonment pursuant to this conviction.  Id., Exh. R.

18
19
20
21
22
23
24

        On April 17, 2001, Petitioner filed a timely notice of appeal from the judgment and sentence.  See Answer, Exh. A, Item 178.  Petitioner was appointed counsel to represent him in his direct appeal.  Id., Exh. A at Document 187.  Petitioner raised eleven issues, including a due process claim regarding the prosecutor's closing arguments and the failure to video-tape the police station photo line-up interview with Bryce.  Id., Exh. S.

25
26
27

        On September 26, 2002, the Arizona Court of Appeals rejected all of Petitioner's claims and affirmed his conviction and sentence in a memorandum decision.  See Answer, Exh. V.

28

With regard to Petitioner's due process claim, the Court of Appeals concluded the investigators had "no duty to electronically record interviews, and no evidence was lost or destroyed." Id., Exh. V at 6.  The appellate court also noted a tape of the interview could not have been exculpatory because by that time Bryce had twice identified "Sean" as "daddy" and "daddy" and "Sean" as the person who had harmed his mother. Id., Exh. V at 6.

Petitioner sought review of the decision by the Arizona Supreme Court, which was summarily denied on March 18, 2003. See Petition at 2.  Petitioner did not seek a writ of certiorari from the United States Supreme Court.

On May 20, 2003, Petitioner initiated a timely action seeking state post-conviction relief pursuant to Rule 32, Arizona Rules of Criminal Procedure.  See Answer, Exh. A, Item 204.  The same appointed counsel who had represented Petitioner in his direct appeal was appointed to represent him in his Rule 32 proceedings.  Id., Exh. W.  In his action for post-conviction relief Petitioner raised three general arguments, including an allegation that his trial counsel was unconstitutionally ineffective.  Id., Exh. W.

The Mohave County Superior Court found that Petitioner's ineffective assistance of counsel claim was colorable and conducted an evidentiary hearing regarding Petitioner's claims on April 23, 2004.  See Answer, Exh. A, Item 249.

-39-

At the hearing, neither Petitioner's post-conviction counsel nor the state called Petitioner's trial counsel to explain whether or to what degree the acts or omissions charged as errors were matters of trial strategy. Neither post-conviction counsel nor the state had Mr. Engan provide an affidavit as to the alleged errors, i.e., whether the alleged errors were a matter of his professional trial strategy.

Post-conviction counsel presented the testimony of Dr. Peters, the coroner who had been consulted by trial counsel before the trial. See Answer, Exh. Y at 10-56. Dr. Peters stated he had examined the autopsy reports of Dr. Nelson and Dr. Keen after Petitioner's trial.[29] Id., Exh. Y at 15-16. Dr. Peters testified at the hearing that he disagreed with Dr. Keen's conclusion that homicide was the cause of Ms. McLaughlin's death. Id., Exh. Y at 34-35 & 50. Dr. Peters further testified that he found the means of death to be inconclusive, i.e., that he agreed with Dr. Nelson's opinion. Id., Exh. Y at 50. Dr. Peters admitted that he had performed only 600 autopsies, fewer than Dr. Nelson and many fewer than Dr. Keen, at the time of Petitioner's trial. See id., Exh. Y at 10-56.

Deputy Koonce testified at the hearing regarding the reason he placed two 911 calls on the morning of Ms.

---

[29] Dr. Peters also testified that, in his opinion, it was possible that Ms. McLaughlin sustained the two ovoid bruises on her left temple by falling onto the oval feet of the Buzz Light Year action figure toy, which the crime scene photographs depicted as being situated on the mattress on the left side of her body. Answer, Exh. Y at 37-38.

McLaughlin's death and whether Bryce could have overheard his statements to the dispatcher regarding his mother's death and the rope.   See Answer, Exh. Y at 58-68.   An investigator employed by the Mohave County Public Defender's Office testified Petitioner's retained defense counsel should have investigated whether Ms. McLaughlin's footprints were on an upside-down green toy box found near her body, which would have suggested that she stood on the box to suspend the rope from the ceiling hooks. Id., Exh. Y at 75-77.   The investigator also stated defense counsel should have determined whether the Buzz Lightyear doll found on the mattress near Ms. McLaughlin had caused the ovoid subcutaneous bruises on her forehead.   Id., Exh. Y at 76-77.

Janet Ward, who remarried Petitioner after Ms. McLaughlin's death, testified at the post-conviction evidentiary hearing about her pretrial consultations with defense counsel, Mr. Engan.   Id., Exh. Y at 95-98.   She also testified as to rumors that a deceased man had "confessed" killing Ms. McLaughlin to a third party.   Id., Exh. Y at 91-100. Petitioner's mother also testified at the post-conviction hearing about the recitals of a person named Tana Hamlin, an unavailable witness, to the effect that a person named Ray Viera had confessed to Ms. Hamlin that he had killed Ms. McLaughlin. Id., Exh. Y at 101-05. Petitioner's mother testified Mr. Engan had decided not to present a suicide theory at trial.   Id., Exh. Y at 99.   Dr. Anna Scherzer also offered testimony at the hearing about post-partum depression and the alleged defects in the forensic interviews with Bryce.   Id., Exh. Y at 115-55.

-41-

On May 17, 2004, the trial court issued a lengthy order denying post-conviction relief.  <u>See</u> Answer, Exh. A, Item 249; Exh. AA.

Petitioner filed a timely petition for review with the Arizona Court of Appeals.  <u>See</u> <u>id.</u>, Exh. C.  On October 17, 2005, the Arizona Court of Appeals summarily denied review of the trial court's denial of relief.  <u>See</u> <u>id.</u>, Exh. AA. Petitioner sought review of this decision by the Arizona Supreme Court, which was denied on May 25, 2006.  <u>See</u> <u>id.</u>, Exh. BB.

On March 19, 2007, Petitioner filed the instant habeas petition.  Respondents allow the petition is timely filed and that the claims have been properly exhausted.

**II Applicable law**

The Court may not grant a writ of habeas corpus to a state prisoner on a claim adjudicated on the merits in state court proceedings unless the state court reached a decision contrary to clearly established federal law, or one involving an unreasonable application of clearly established federal law, or unless the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding.  <u>See</u> 28 U.S.C. § 2254(d) (1994 & Supp. 2008); <u>Panetti v. Quarterman</u>, 127 S. Ct. 2842, 2858 (2007); <u>Carey v. Musladin</u>, 549 U.S. 70, 127 S. Ct. 649, 653 (2006); <u>Rompilla v. Beard</u>, 545 U.S. 374, 390, 125 S. Ct. 2456, 2467-68 (2005); <u>Cook v. Schriro</u>, 516 F.3d 802, 816 (9th Cir. 2008).

When more than one state court has adjudicated a claim, the Court must analyze the last reasoned decision to determine

-42-

if the state's denial of relief on the claim was clearly contrary to federal law. See <u>Barker v. Fleming</u>, 423 F.3d 1085, 1091-92 & n.3 (9th Cir. 2005), <u>cert.</u> <u>denied</u>, 126 S. Ct. 2041 (2006). Petitioner bears the burden of proving his constitutional rights were violated. <u>See</u>, <u>e.g.</u>, <u>Cook</u>, 516 F.3d at 816.

> A state court's decision is "contrary to" our clearly established law if it applies a rule that contradicts the governing law set forth in our cases or if it confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.

<u>Mitchell v. Esparza</u>, 540 U.S. 12, 14, 124 S. Ct. 7, 10 (2003) (internal citations and quotations omitted).

The standard of review, i.e., the "unreasonable application" prong of the statute, is not the same as the "clear error" standard applied by United States Courts of Appeal when reviewing the decisions of lower courts. See <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71, 123 S. Ct. 1166, 1172-73 (2003). "The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." <u>Id.</u>, 538 U.S. at 75, 123 S. Ct. at 1175. <u>See also</u> <u>Martinez v. Garcia</u>, 379 F.3d 1034, 1037-38 (9th Cir. 2004); <u>Hall v. Director of Corr.</u>, 343 F.3d 976, 986 (9th Cir. 2003); <u>Clark v. Murphy</u>, 331 F.3d 1062, 1068 (9th Cir. 2003).

If the United States Supreme Court has not addressed the issue raised by Petitioner in its holdings, the state court's adjudication of the issue cannot be contrary to, or an

-43-

unreasonable application of, clearly established federal law. See Stenson v. Lambert, 504 F.3d 873, 881 (9th Cir. 2007), citing Kane v. Espitia, 546 U.S. 9, 10, 126 S. Ct. 407, 408 (2006). See also House v. Hatch, 527 F.3d 1010, 1018 (10th Cir. 2008) ("Musladin has now dispelled the uncertainty: The absence of clearly established federal law is dispositive under § 2254(d)(1)."). Accordingly, if the issue raised by the petitioner "is an open question in the Supreme Court's jurisprudence," the Court may not issue a writ of habeas corpus on the basis that the state court unreasonably applied clearly established federal law by rejecting the precise claim presented by the petitioner. Cook, 516 F.3d at 818, quoting Carey, 127 S. Ct. at 654; Crater v. Galaza, 491 F.3d 1119, 1123 (9th Cir. 2007), cert. denied, 128 S. Ct. 2961 (2008).

The conclusion that a state court decision was contrary to or an unreasonable application of federal law does not *ipso facto* warrant granting of the writ. See Frantz v. Hazey, 513 F.3d 1002, 1016 (9th Cir. 2008). If the Court determines that the state court's decision was contrary to or an unreasonable application of clearly established law, the Court must review whether Petitioner's constitutional rights were violated, i.e., the state's ultimate denial of relief, without the deference to the state court's decision that the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") otherwise requires. See Panetti, 127 S. Ct. at 2858-59; Rompilla, 545 U.S. at 390, 125 S. Ct. at 2467-68; Frantz, 513 F.3d at 113-15. See also Larson v.

Palmateer, 515 F.3d 1057, 1061-62 (9th Cir. 2008).[30]

These guiding principles were recently reaffirmed by the Seventh Circuit Court of Appeals:

> As to claims which we do consider, we "shall not" grant the writ on any claim that was, in fact, considered on the merits in the state court, unless the state court decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 376, 120 S. Ct. 1495, [] (2000). The Court has recently reemphasized that a state court's application of clearly established law is acceptable, even if it is likely incorrect, so long as it is reasonable. Wright v. Van Patten, --- U.S. ----, 128 S. Ct. 743, [] (2008). If, however, the state court decision is "contrary to" or an "unreasonable application of" clearly established federal law as determined by the

---

[30]

> Under AEDPA, a federal court is permitted to grant habeas relief only if the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). To prevail, the petitioner must demonstrate "that the state court's application of Supreme Court precedent to the facts of his case was not only incorrect but 'objectively unreasonable.'" Davis v. Woodford, 384 F.3d 628, 637-38 (9th Cir. 2004) (quoting Woodford v. Visciotti, 537 U.S. 19, 25, 123 S. Ct. 357, 154 L.Ed.2d 279 (2002)). If the state court reaches the merits without providing reasoning for us to review, however, "we independently review the record to determine whether the state court clearly erred in its application of Supreme Court law." Brazzel v. Washington, 491 F.3d 976, 981 (9th Cir. 2007) (internal quotation marks omitted).

-45-

1
2
Supreme Court, then our consideration is de novo. <u>Wiggins v. Smith</u>, 539 U.S. 510, 123 S. Ct. 2527, [] (2003); <u>see also</u> <u>Williams</u>, 529 U.S. 362, 120 S. Ct. 1495.

3
<u>Johnson v. Loftus</u>, 518 F.3d 453, 456 (7th Cir. 2008).

4
**III Analysis of Petitioner's claims for relief**

5
**A.  Ineffective assistance of trial counsel**

6
7
8
9
10
11
12
13
14
15
16
17
18
19
To be awarded habeas relief based on a claim that they were denied their Sixth Amendment right to the effective assistance of counsel, a petitioner must show that his attorney's performance was deficient and that the deficiency prejudiced the petitioner's defense.  <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); <u>Lambright v. Stewart</u>, 241 F.3d 1201, 1206 (9th Cir. 2001).  To prevail on the merits of a Sixth Amendment claim, "it is the habeas applicant's burden to show that the state court applied <u>Strickland</u> to the facts of his case in an objectively unreasonable manner.  An unreasonable application of federal law is different from an incorrect application of federal law." <u>Woodford</u>, 537 U.S. at 25, 123 S. Ct. at 360 (internal quotations omitted).

20
21
22
23
24
25
26
27
The petitioner must overcome the strong presumption that his counsel's conduct was within the range of reasonable professional assistance required of attorneys in that circumstance.  <u>See</u> <u>Strickland</u>, 466 U.S. at 687, 104 S. Ct. at 2064.  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

28

challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id., 466 U.S. at 689, 104 S. Ct. at 2065.

"A standard of reasonableness applied as if one stood in counsel's shoes spawns few hard-edged rules," and the merits of counsel's investigative choices may often be "subject to fair debate." Rompilla, 545 U.S. at 381, 125 S. Ct. at 2462. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Indeed, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable...." Id., 466 U.S. at 690-91, 104 S. Ct. at 2066.

To establish prejudice, the second prong of Strickland, the petitioner must show that, but for their counsel's error, there is a reasonable probability that the outcome of their criminal proceedings would have been different. See Pinholster v. Ayers, 525 F.3d 742, 757 (9th Cir. 2008). A "reasonable probability" is a probability sufficient to undermine the Court's confidence in the outcome of the state criminal proceedings. See, e.g., Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable

-47-

doubt respecting guilt." <u>Richter v. Hickman</u>, 521 F.3d 1222, 1229-30 (9th Cir. 2008). In assessing prejudice to Petitioner from his counsel's allegedly deficient performance, the District Court must "evaluate the totality of the evidence--both that adduced at trial, and the evidence adduced in the habeas proceeding[s]." <u>Wiggins v. Smith</u>, 539 U.S. 510 536, 123 S. Ct. 2527, 2543 (2003). <u>See also</u> <u>Stephens v. Hall</u>, 294 F.3d 210, 218 (1st Cir. 2002).

Petitioner alleges his counsel failed to interview potential alibi or corroborative witnesses and failed to hire an investigator or request that an investigator be appointed to assist him. He further alleges his trial counsel failed to investigate crime scene evidence and, accordingly, that his counsel misinterpreted the available evidence. Petitioner also contends his counsel failed to understand the medical examiner's evidence, which he asserts "strongly supported a suicide scenario," and that counsel failed to adequately question his own expert to support this defense. Petitioner further argues he was prejudiced by his counsel's failures.

The ineffective assistance claims asserted in the federal habeas petitioner were raised in Petitioner's first action for post-conviction relief. After the evidentiary hearing conducted in this matter, the state court denied relief. <u>See</u> Answer, Exh. A, Document No. 249.[31] The state court noted

---

[31] The Superior Court's written opinion in Petitioner's action for post-conviction relief is also attached to the petition for habeas relief as Exhibit B.

-48-

that the standard stated in <u>Strickland v. Washington</u> governed
Petitioner's ineffective assistance of counsel claim.

The trial court stated:

> The Court makes an initial and, admittedly,
> entirely subjective observation. Trial
> counsel in this case, Mr. Engan, has been
> trying cases in this Court since 1996. As of
> this date he has tried 16 cases to juries
> before this Court, the Defendant's trial
> being the 12th. Four of those cases were
> homicides. ... Four of those trials resulted
> in defendants being convicted of nothing ...
> The Court points out the above not to suggest
> that Mr. Engan's performance at trial must or
> even may be gauged by what he has done in
> other trials before and since the Defendant's
> trial. The Court simply offers this as
> historical background for its opinion
> regarding Mr. Engan. This Court finds Mr.
> Engan to be an aggressive, assertive, zealous
> advocate for his criminal clients who seldom
> concedes anything to the prosecution and is
> generally willing to contest everything that
> the State proposes to do. ...
> The Court recalls this case as one of the
> most contentious it has ever presided over,
> both before, during and after the trial...

<u>Id.</u>, Exh. A, Document No. 249 at 2-3.

The trial court noted, *inter alia*, that defense counsel
had succeeded in "getting" an evidentiary hearing regarding
Bryce's competency to testify and that counsel had "obtain[ed]"
several pretrial rulings in evidentiary issues that were
favorable to his client." <u>Id.</u>, Exh. A, Document No. 249 at 3
The trial court then continued: "Having said all this, the Court
is aware, and will consider Defendant's claim in the light of
the fact, that any one instance of deficient performance by Mr.
Engan in this case which affected the eventual outcome would
require granting relief." <u>Id.</u>, Exh. A, Document No. 249 at 3-

-49-

4.[32]

With regard to Petitioner's assertion concerning counsel's failure to hire an investigator, the trial court determined that the act was a "conscious decision" "rather than a failure to understand the law or applicable procedures..." Exh. A, Document No. 249 at 4. The trial court concluded it was

> not prepared to make a blanket finding that no defense attorney could ever himself do as good a job investigating a case for trial as could a court-appointed investigator. The Court does not believe that choosing to forego the use of an investigator ... is in and of itself a deficient performance failing to meet prevailing professional standards. To the extent that it would have been relevant, the Defendant has presented no evidence to establish a minimal level of professionalism which his trial attorney failed to attain.

Id., Exh. A, Document No. 249 at 5.

The trial court additionally concluded that Petitioner was not prejudiced by the "lack of an investigator at trial." Id., Exh. A, Document No. 249 at 5. The trial court noted the testimony presented at the evidentiary hearing regarding "what a qualified investigator could have done in this case ... and note[d] that it is familiar with some of the local private investigators in this area that would have been available to Mr. Engan and wonders whether they would have been as qualified as" the expert who testified at the hearing (who was employed by the Mohave County Public Defender's Office). Id., Exh. A, Document

---

[32] The state post-conviction court eventually concluded that, even if counsel's performance had been deficient with regard to any single alleged error, Petitioner was not prejudiced by the alleged error. Answer, Exh. A, Document No. 249 at 5-13.

-50-

1    No. 249 at 5.    The trial court concluded that the expert's

2    suggestions, including requesting the tape of Mr. Koonce's

3    initial 911 call, "would have been of marginal value." _Id._,

4    Exh. A, Document No. 249 at 5.

5               The court further stated:

6               The victim in this case was Bryce's mother,
                so victims rights could be asserted on behalf
7               of him.   The Court doubts that the victim's
                family would have consented to numerous
8               further interviews and a walk-through of the
                scene where he saw his mother die in addition
9               to what the police had already done.

10   _Id._, Exh. A, Document No. 249 at 6.

11              The trial court stated a

12              critical aspect of the defense [was] that the
                victim committed suicide.   Mr. Bernard at the
13              evidentiary hearing proposed a plausible
                theory that the victim could have placed the
14              rope in position while standing on the green
                toy box shown in the photographs, could have
15              asphyxiated herself by leaning forward
                against the rope as opposed to dangling from
16              it, and could have fallen against the Buzz
                Lightyear doll shown in the photographs ...

17   _Id._, Exh. A, Document No. 249 at 6.

18              The trial court noted that: "With the passage of time,

19   it is unlikely that testing of these items would yield any

20   meaningful results, even if they were still available." _Id._,

21   Exh. A, Document No. 249 at 6.   The trial court "sympathize[d]

22   with the difficulty the defense has several years later in

23   trying to prove that what an investigator could have done would

24   have made a difference, but it is the defense who has the burden

25   of proof on this issue." _Id._, Exh. A, Document No. 249 at 7.

26              The Court's position is that the Defendant
                has simply come up with another theory as to
27

28                                  -51-

1
2
3
4
5
6
7
8
9

> how the victim could have committed suicide.
> ... The Court is unable to conclude that his
> theory ... was any less believable than Mr.
> Bernard's theory.  This case, in addition,
> did not solely hinge upon whether the death
> was a homicide or a suicide.  The State
> relied upon other evidence to support its
> theory of murder, including circumstantial
> evidence and what was apparently the eye-
> witness testimony of the victim's son.
> Arguing Mr. Bernard's theory to the jury ...
> would not have appreciably increased the
> likelihood of the jury concluding that this
> was a suicide rather than a homicide.  The
> Court determines that the Defendant failed to
> show by a preponderance of the evidence that
> trial counsel was ineffective by virtue of
> failure to obtain and use an investigator.

10   Id., Exh. A, Document No. 249 at 7.

11
12   Addressing Petitioner's other specific allegations of

ineffective representation, the trial court stated:

13
14
15
16

> What is interesting about this case is that
> the claims for relief which the Court found
> most compelling in ruling that a colorable
> claim had been made turned out to be the
> claims which were for all intents and
> purposes abandonned (sic) at the evidentiary
> hearing granted because of those claims...,

17   including the claim that counsel failed to adequately interview

18   "unbiased" neighbors to corroborate Petitioner's alibi and the

19   failure to "present unbiased neighbors to corroborate the theory

20   of suicide."  Id., Exh. A, Document No. 249 at 7 & 8.

21   With regard to the assertion that counsel erred by

22   failing to further investigate the differences in the coroner's

23   opinions with Dr. Peters prior to Petitioner's trial, the trial

24   court stated: "With the benefit of hindsight one can argue that

25   Mr. Engan should have gone one step further and asked Dr. Peters

26   whether reviewing the records and asking him to render an

27
28
                                    -52-

opinion based thereon, as opposed to actually doing another autopsy, might yield something productive." Id., Exh. A, Document No. 249 at 8. The trial court concluded that this did not satisfy the Strickland standard and noted that defense counsel already had the opinion of Dr. Nelson that the manner of death could not be determined. Id., Exh. A, Document 249 at 8-9.

The trial court also determined any error was not prejudicial because it was likely "the jury would have found more persuasive the testimony of Dr. Keen, whose experience, whether measured by years, autopsies or levels of responsibility, far exceeded that of both Dr. Nelson and Dr. Peters combined." Id., Exh. A, Document No. 249 at 9.

The undersigned has scrupulously and meticulously examined the entire and extensive record in this matter. The undersigned concludes that counsel's performance was not unconstitutionally deficient and that the state court did not err in determining that trial counsel's performance was not unconstitutionally deficient and that Petitioner was not prejudiced by any alleged deficiency in counsel's performance. The primary evidence against Petitioner was Bryce's testimony and Bryce's pre-trial statements, including the forensic interview tapes and the testimony of the forensic interviewers. If the jury believed Bryce's testimony, it could reasonably find Petitioner guilty of causing Ms. McLaughlin's death.

Petitioner's counsel vigorously challenged the introduction of Bryce's testimony and Detective Spoerry's

1
2
3
4
5
6
7

evidence regarding Bryce's identification of Petitioner as the person who had put a rope around his mother's neck. Counsel also did an excellent job of cross-examining Bryce and the forensic interviewers, and indicating for the jury why Bryce's statements should not be believed. The jury believed the testimony of Bryce and the credibility of witnesses is within the province of the jury.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Counsel also did an adequate job of emphasizing to the jury that there was no independent eyewitness testimony or other convincing evidence placing Petitioner at the scene of Ms. McLaughlin's death during the "window" of opportunity established by the medical evidence. Nonetheless the jury, could also reasonably disbelieve the testimony of Timothy Ward, Petitioner's primary alibi witness, or concluded that Petitioner had left Mr. Ward's home and gone and returned to Ms. McLaughlin's home without his brother's knowledge. Counsel's apparent trial strategy of emphasizing the weaknesses in Bryce's recitation of events, the absence of physical evidence to establish the state's theory of the case, i.e., that a fight or sexual activity had occurred, the opportunity others had to cause Ms. McLaughlin's death, and the absence of any eyewitness testimony other than Bryce's placing Petitioner at Ms. McLaughlin's house on the night in question, was not the selection of a strategy that was per se below the standard of reasonable professionals in that circumstance. The fact that the jury ultimately believed Bryce's testimony and the other evidence implicating Petitioner does not render counsel's

28

-54-

performance below that required by <u>Strickland</u>.

Petitioner further alleges counsel did an inadequate job of establishing Ms. McLaughlin had committed suicide and establishing there was insufficient evidence of murder as a manner of death.  The evidence offered by Dr. Peters at the post-conviction hearing must be considered along with the evidence presented at trial, i.e., that of Dr. Keen and Dr. Nelson.  Dr. Keen, who was presented to the jury as being the more experienced pathologist, was positive Ms. McLaughlin had been murdered.  Neither Dr. Nelson nor Dr. Peters was willing to conclusively state that suicide, rather than homicide, was the manner of death.  Accordingly, the jury could reasonably find that the manner of death was homicide, balancing the non-conclusive statements of Dr. Peters and Dr. Nelson with the positive opinion from Dr. Keen combined with the non-medical testimony and evidence, such as Bryce's testimony.

The undersigned again notes the failure of post-conviction counsel and the state to not provide the state court with any record in this matter regarding trial counsel's strategy in light of the errors alleged by Petitioner.  Because Mr. Engan was not called at the post-conviction hearing, nor was an affidavit provided at the state court level, the undersigned must divine from the record whether the state trial court's decision determining the <u>Strickland</u> claims was correct or

incorrect without the benefit of this information.[33]

For example, Janet Ward, Petitioner's wife, testified at the post-conviction hearing that Mr. Engan made a decision prior to the trial not to press the theory that Ms. McLaughlin committed suicide. It appears from the trial record in this matter that Mr. Engan made a strategic decision to insert reasonable doubt on the state's case by implying Mr. Light, Ms. McLaughlin's step-father, had killed Ms. McLaughlin. Emphasizing the assertion that Ms. McLaughlin had committed suicide would have been inconsistent with forwarding the theory that Mr. Light murdered Ms. McLaughlin. Mr. Engan presented testimony that Mr. Light had told at least two people he had seen Ms. McLaughlin on Sunday night and that they had argued that night. By virtue of its verdict the jury did not, apparently, believe these witnesses and did not find that reasonable doubt existed as to Petitioner's guilt.

The undersigned's conclusion in this matter, after a serious, minute, and thoughtful perusal of the record, is that, at the end of the day, the jury believed Bryce when he said "Daddy did it" and that "Daddy" meant Petitioner. Petitioner's counsel was not unconstitutionally ineffective for his failure to win an acquittal for Petitioner in the face of the jury's

---

[33] A defendant who collaterally attacks their criminal conviction and sentence raising a claim they were denied their federal constitutional right to the effective assistance of trial counsel thereby waives his right to the attorney-client privilege with regard to his communications with his trial defense counsel. See, e.g., Lambert v. Blodgett, 393 F.3d 943, 959 (9th Cir. 2004); Johnson v. Alabama, 256 F.3d 1156, 1178 (11th Cir. 2007); Arizona v. Cuffle, 171 Ariz. 49, 51-52, 828 P.2d 773, 775-76 (1992).

specific role, which is to determine the credibility of witnesses.

**1.    Petitioner contends his trial counsel failed to investigate potential witnesses**

Petitioner alleges his counsel's performance was deficient because counsel did not locate, interview, or subpoena Ms. McLaughlin's neighbors, Yvonne Johnson or Philip Enoch, who he asserts had relevant exculpatory information regarding Petitioner's alibi defense, and each of whom gave statements to the police.  The state trial court implicitly stated in it's decision denying post-conviction relief that Petitioner's trial counsel's performance would have been found deficient if he had failed to interview witnesses.  The state court went as far as stating its belief that this was Petitioner's strongest ineffective assistance of counsel argument.  The state court noted this claim was the basis for its granting of a post-conviction evidentiary hearing.  However, the state court decision then determines that Petitioner "abandoned" this claim by not pursuing it further during the evidentiary hearing.

The undersigned concludes trial counsel's performance was not deficient in this regard nor was any such deficiency prejudicial because the evidence provided by Yvonne Johnson or Philip Enoch would have, at best, been cumulative to the other alibi evidence presented at Petitioner's trial, i.e., that of Tim Ward, Jennifer Gadjos, and Sherri Jacobs.  It is also unlikely that the jury would have been more swayed by testimony from "unbiased neighbors" that Ms. McLaughlin was so distraught

in the days after Alana's death that she committed suicide, as compared to the testimony offered by her family, friends, and former roommates, that she was depressed, vacant, listless, and not eating, in the interval between Alana's death and her own, and the testimony of an expert witness about potential suicide after the death of an infant.

**2. Petitioner contends counsel's failure to hire an investigator or request funds for a court-appointed investigator constituted prejudicial deficient performance in violation of his Sixth Amendment rights.**

Petitioner asserts the evidence presented at the hearing on his petition for post-conviction relief established that trial counsel's investigation of his defense was inadequate. Petitioner produced expert testimony at the hearing that counsel's investigation was inadequate and that, had counsel procured a professional investigator, the investigator would have cured this deficiency. The expert testified that a professional investigator would have conducted: an analysis of the Buzz Lightyear toy found next to Ms. McLaughlin's head to see if her blood or tissue was on the toy and an analysis of the green toy box found near Ms. McLaughlin's body to see if it had her footprints on it, indicating she had climbed on the box and thus supporting the suicide theory. The expert also testified a professional would have requested production of Officer Koonce's initial 911 call indicating Ms. McLaughlin had committed suicide. Additionally, the expert investigator stated he had learned Petitioner's car had an oil leak at the time in

-58-

1   question and that photos of Ms. McLaughlin's driveway did not
2   show fresh oil, which fact supported Petitioner's contention he
3   did not drive to the home that night in his car.

4         The guarantees afforded by the United States
5   Constitution require trial counsel to make "reasonable"
6   investigations or to make a "reasonable decision that makes
7   particular investigations unnecessary." Strickland, 466 U.S. at
8   691, 104 S. Ct. at 2066.   See also Wiggins, 539 U.S. at 523,
9   123 S. Ct. at 2536 (explaining that whether counsel's
10  investigation was reasonable requires "a context-dependent
11  consideration of the challenged conduct as seen 'from counsel's
12  perspective at the time'").  The Ninth Circuit Court of Appeals
13  has concluded counsel's performance was unconstitutionally
14  deficient "where he neither conducted a reasonable investigation
15  nor made a showing of strategic reasons for failing to do so
16  ..." Avila v. Galaza, 297 F.3d 911, 918-19 (9th Cir. 2002).
17  But see Johnson v. Loftus, 518 F.3d 453, 457 (7th Cir. 2008)
18  (state court's decision was not error because it could presume
19  counsel's choice was strategic in the absence of evidence to the
20  contrary).

21        With regard to the prejudice prong of the Strickland
22  test in these circumstances, the Ninth Circuit Court of Appeals
23  has held prejudice from defense counsel's failure to adequately
24  investigate is more likely when the prosecution's case against
25  the defendant is weak.  See, e.g., Avila, 297 F.3d at 924
26  (collecting the cases so holding).  However, as long as trial
27  counsel made reasonable choices, what further investigations

28                              -59-

might have uncovered is irrelevant. <u>Williams v. Woodford</u>, 384 F.3d 567, 615-16 (9th Cir. 2004). The duty to investigate is not limitless. <u>Cf.</u> <u>Wiggins</u>, 539 U.S. at 533, 123 S. Ct. at 2541 (holding in the context of a sentencing hearing that an attorney need not "investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant."). <u>See</u> <u>also</u> <u>Stankewitz v. Woodford</u>, 365 F.3d 706, 719 (9th Cir. 2004).

The Ninth Circuit concluded in <u>Avila</u> that counsel's performance is unconstitutionally deficient if counsel fails to adequately investigate and to introduce at trial evidence demonstrating the defendant's factual innocence, or if counsel fails to introduce evidence that could have raised sufficient doubt as to a factual question which would undermine confidence in the verdict. <u>See</u> 297 F.3d at 918-19, <u>quoting</u> <u>Hart v. Gomez</u>, 174 F.3d 1067, 1070 (9th Cir. 1999) (finding defense counsel's performance deficient because he failed to review or introduce at trial documents corroborating a defense witness' testimony). <u>See</u> <u>also</u> <u>Reynoso</u>, 462 F.3d at 1112-13; <u>Lord</u>, 184 F.3d at 1093.

Petitioner's trial counsel did not fail to introduce evidence that could have raised sufficient doubt as to a factual question which would undermine the jury's verdict. Some of the evidence would be cumulative to the defense theories presented to the jury, i.e., the theory of suicide. With regard to the "discovery" and introduction of the 911 tape, information was presented to the jury that the police, i.e., Officer Koonce, did not initially determine whether Ms. McLaughlin's death was

1    murder or suicide.   It is unlikely that further testimony
2    regarding what caused the bruises on Ms. McLaughlin's forehead,
3    i.e., the potential they were caused by the Buzz Lightyear toy,
4    would have out-weighed the jury's opinion of Dr. Keen's or Dr.
5    Nelson's testimony on this issue.

6         It is at least arguable whether any evidence of oil in
7    the driveway would have swayed the jury because Petitioner's car
8    had been at the residence one day before the murder and he could
9    have parked the car other than in the driveway on the night in
10   question.   This evidence would also have been cumulative to the
11   defense witness who testified she did not see anything unusual
12   occurring at Ms. McLaughlin's between 5 and 6 p.m., which is
13   close to the time of death propounded by the prosecution.

14        Petitioner's counsel did not request an investigator to
15   assist him in interviewing witnesses, interpreting the crime
16   scene photographs, or in collecting evidence.   Although trial
17   counsel presented two alternative theories of death, i.e.,
18   suicide or another assailant, the theories were presented
19   primarily, with the exception of Dr. Scherzer, through the
20   examination of witnesses called by the prosecution.   However,
21   counsel did call Dr. Scherzer to discount the forensic
22   interviews with Bryce and to support the theory that Ms.
23   McLaughlin could have committed suicide.   Trial counsel also
24   cross-examined prosecution witnesses regarding their potential
25   biases against Petitioner and ulterior motives the witnesses may
26   have had with regard to their testimony against Petitioner.

27

28                                    -61-

Accordingly, the state court's conclusion that counsel did not err by failing to hire an investigator and that such error was not prejudicial, was not objectively unreasonable application of federal law. Compare Sanders v. Rattelle, 21 F.3d 1446, 1456-57 (9th Cir. 1994) (finding defense counsel's performance deficient because he failed to investigate or introduce at trial evidence implicating someone who previously confessed to the shooting, and finding the deficiency prejudiced the defendant despite the fact that five witnesses testified at trial that the petitioner was the shooter).

**3.   Petitioner asserts his counsel's performance was deficient because he inadequately examined both his own expert and the state's expert, depriving the jury of important information relating to the cause of death.**

It is very difficult for a petitioner to succeed on a claim that his counsel's examination of witnesses constituted prejudicial deficient performance because of the strong presumption of competence granted counsel in this regard by Strickland. See Kimmelman v. Morrison, 477 U.S. 365, 106 S. Ct. 2574, 2586 (1986) (stating the petitioner bears a heaving, though not insurmountable, burden of persuasion on this issue). Because there is no obvious bright-line standard for judging how competent counsel would question a specific witness in a specific case, counsel's questioning of witnesses must be taken as competent as long as their approach "might be considered sound trial strategy." Darden v. Wainwright, 477 U.S. 168, 106 S. Ct. 2464, 2474 (1986). The undersigned concludes, after a

thorough review of the trial transcript, that counsel's examination of the expert witnesses was neither deficient nor prejudicial and the state court did not err in determining that Petitioner was not deprived of his right to the effective assistance of counsel with regard to this specific assertion of error.

**4. Petitioner contends his counsel failed to adequately argue the evidence in counsel's closing argument.**

> The right to effective assistance extends to closing arguments. [] Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should sharpen and clarify the issues for resolution by the trier of fact, [] but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forgo closing argument altogether. []. Judicial review of a defense attorney's summation is therefore highly deferential-and doubly deferential when it is conducted through the lens of federal habeas.

Yarborough v. Gentry, 540 U.S. 1, 5-6, 124 S. Ct. 1, 4 (2003) (internal quotations and citations omitted), reversing Gentry v. Roe, 320 F.3d 891 (9th Cir. 2002).

In Yarborough, the Supreme Court held that, because defense attorneys must make strategic decisions as to what arguments to include in closing arguments and they may choose to acknowledge the "shortcomings" of their client's case in order to build credibility with the jury, the acknowledgment of inculpatory evidence in closing argument does not constitute

1
2
deficient performance.   <u>See</u> <u>Hovey v. Ayers</u>, 458 F.3d 892, 906 (9th Cir. 2006).

3
4
5
6
7
8
9
10
11
12
13
14
15
After a thorough review of the entire record, the undersigned cannot say that Petitioner's counsel "ignored" beneficial evidence during his closing argument.   Although defense counsel addressed the prosecution's evidence against his client, including the inflammatory evidence regarding Petitioner's and Ms. McLaughlin's sexual activity, counsel highlighted many of the weaknesses in the prosecution's case in his closing argument and also argued to the jury that the inflammatory evidence was not evidence of Ms. McLaughlin's murder.   Nonetheless, counsel's closing argument comports with the constitutional standard of competence stated in <u>Yarborough</u>. Accordingly, the state court's decision denying this claim was not an unreasonable application of federal law.

16
17
18
19
20
21
22
23
24
25
26
27
Petitioner asserts his counsel's behavior is analogous to that criticized by the Tenth Circuit Court of Appeals in <u>Fisher v. Gibson</u>, 282 F.3d 1283, 1300 (10th Cir. 2002).   In that case the Tenth Circuit Court of Appeals held defense counsel's performance was below an objectively reasonable standard because counsel was, *inter alia*, hostile to his client and his client's interests and defense counsel displayed sympathy for the state's case and failed to advance any defense theory, including failing to make a closing argument at all.   The Tenth Circuit noted that, in that case, defense counsel had badgered his own client on the stand, asked his client "entirely inappropriate questions," and was "generally hostile towards his own client."

28

1   Id., 282 F.3d at 1300.

2           Petitioner's counsel was not hostile to his client.
3   Although counsel commented on evidence which a majority of
4   citizens might view as distasteful, the written record in this
5   matter does not indicate that counsel was hostile to his client
6   during questioning and counsel apparently mentioned the
7   distasteful evidence for the purpose of arguing, as a sufficient
8   defense would be required to do, that Petitioner's predilection
9   for photographing or videotaping consensual sexual acts and for
10  engaging in bondage, did not establish that he was a murderer,
11  was not deficient performance.   Accordingly, the state court's
12  conclusion in this regard was not clearly contrary to federal
13  law and Petitioner is not entitled to habeas relief on this
14  claim.

15          **B.  Petitioner contends he is entitled to habeas relief**
16  **because the state violated his right to due process and a fair**
17  **trial by failing to tape Detective Spoerry's interview with**
18  **Bryce.**

19          Petitioner asserts he was denied his constitutional
20  right to due process of law because the state, in bad faith,
21  failed to preserve or create possibly exculpatory evidence,
22  i.e., Detective Spoerry did not tape the police station
23  interview with Bryce McLaughlin and he purposefully did not tape
24  the interview so that Bryce's statements to Detective Spoerry
25  could not be impeached at trial.

26          In denying relief in Petitioner's direct appeal, the
27  state Court of Appeals concluded:

28                              -65-

1
2
3
4
5
6
7
8
9

      A defendant's right to due process can be violated if the State, acting in bad faith, fails to preserve or destroys evidence that is constitutionally material.[] Evidence is constitutionally material if it had exculpatory value apparent to the police when it was lost or destroyed, but the police have no duty to electronically record interviews, and no evidence was lost or destroyed. <u>See</u> <u>State v. Havatone</u>, 159 Ariz. 597, 600, 769 P.2d 1043, 1046 (App. 1989).

      Also, it is doubtful that a recording would have been exculpatory. By the time when [Bryce] readily chose Ward's picture out of both line-ups and referred to Ward as "Daddy," [Bryce] already had consistently identified Ward as "Daddy" and "Sean" and as the person who had hurt his mother.

10
Answer, Exh. V at 5-6.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
      Although the Supreme Court has established that the bad faith failure to <u>preserve</u> or to <u>collect</u> potentially exculpatory evidence is a violation of the defendant's right to due process of law, there is no United States Supreme Court opinion holding that the prosecution's bad faith failure to <u>create</u> potential impeachment evidence, i.e., to video-tape a photographic line-up, as compared to the failure to preserve a videotape once created or to not conduct a photographic line-up if they believe it is more likely it might be exculpatory, is a violation of the defendant's right to due process of law. <u>Compare</u> <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 625-26 (9th Cir. 1997); <u>Miller v. Vasquez</u>, 868 F.2d 1116, 1120 (9th Cir. 1989); <u>Schad v. Schriro</u>, 454 F. Supp. 2d 897, 914-15 (D. Ariz. 2006). <u>Cf.</u> <u>United States v. Hernandez</u>, 109 F.3d 1450, 1455 (9th Cir. 1997) ("The mere failure to preserve evidence which could have been subjected to tests which might have exonerated the defendant does not

27
28

constitute a due process violation."). Accordingly, the state court's conclusion that Petitioner's federal constitutional right to a fair trial was not violated by the failure to video-tape Detective Spoerry's interview with Bryce was not an unreasonable application of clearly established federal law. See Wright v. Van Patten, 128 S. Ct. 743, 746-47 (2008).[34]

**C. Petitioner asserts he is entitled to federal habeas relief because the prosecutor made improper comments during his closing argument which violated Petitioner's right to due process of law.**

Petitioner alleges that, during the state's closing rebuttal argument, the prosecutor vouched for his witnesses, insinuated additional knowledge of the case, and made other inappropriate comments which violated his Fourteenth Amendment right to due process of law and a fair trial.

In rejecting Petitioner's claim that the prosecutor's closing arguments constituted misconduct in violation of his right to due process of law, the Arizona Court of Appeals stated:

> To prevail on such a claim, a defendant must demonstrate that the misconduct "so infected

---

[34]

Because our cases give no clear answer to the question presented, [whether counsel's pretrial hearing appearance by speaker-phone was a violation of the Cronic doctrine], let alone one in [the petitioner's] favor, "it cannot be said that the state court 'unreasonabl[y] appli[ed]' clearly established Federal law.'" Musladin, 549 U.S., at ----, 127 S. Ct. 649, 654 (quoting 28 U.S.C. § 2254(d)(1)). Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized.

-67-

the trial with unfairness as to make the
resulting conviction a denial of due
process." <u>State v. Hughes</u>, 193 Ariz. 72, 79
126, 969 P.2d 1184, 1191 (1998) (quoting
<u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643
(1974) ). In reviewing the transcript of the
prosecutor's closing argument, we find two
instances of impermissible conduct. At one
point, the prosecutor referred to defense
counsel in perjorative terms: "I believe Mr.
Engan does not have any interest in looking
at the truth in this case." <u>See</u> <u>Hughes</u>, 193
Ariz. at 85 759, 969 P.2d at 1197 (finding
counsel cannot make insinuations not
supported by the record).
On another occasion, the prosecutor
essentially vouched for his case: Anybody
here think that I or [the detective] or the
police department don't have things better to
do than just say gee, I think that I will
prosecute Sean Patrick Ward today. You think
that you don't have better things to do with
your time." <u>See</u> <u>State v. Leon</u>, 190 Ariz. 159,
162, 945 P.2d 1290, 1293 (1997) (putting
prestige of government behind case). While
these remarks were arguably in response to
statements made about the police by defense
counsel in his closing argument, they were
nonetheless improper. However, *Ward did not
object to any of the statements to which he
points on appeal, and we cannot say that the
prosecutor's remarks deprived Ward of a fair
trial.*

Answer, Exh. V at 18-19.

When a federal habeas petitioner asserts that
prosecutorial misconduct violated their right to due process,
the Court must consider whether the alleged error infected the
entire proceeding such that the proceeding was rendered
completely unfair. <u>See</u> <u>Hardnett v. Marshall</u>, 25 F.3d 875, 879
(9th Cir. 1994).

On federal habeas review, we do not ask
whether the prosecutor's remarks were
undesirable or even universally condemned.
Improper argument does not, per se, violate
a defendant's constitutional rights. If

-68-

> prosecutorial misconduct is established, and it was constitutional error, we then apply the <u>Brecht</u> harmless error test. The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.

<u>Fields v. Woodford</u>, 309 F.3d 1095, 1108-09 (9th Cir. 2002)(internal citations and quotations omitted).

The state court concluded that, although the prosecutor had made statements in violation of Petitioner's rights, the errors were harmless with regard to the overall fairness of Petitioner's criminal proceedings. This decision was not clearly contrary to federal law. The Court concludes the statement of the prosecutor did not so infect the trial with unfairness as to make the resulting conviction a violation of due process. <u>See</u> <u>Williams v. Borg</u>, 139 F.3d 737, 745 (9th Cir. 1998); <u>Thompson v. Borg</u>, 74 F.3d 1571, 1576-77 (9th Cir. 1996) (denying habeas relief based on a due process claim regarding a prosecutor's comments in closing argument because, in part, the jury returned a verdict of second degree murder rather than first degree murder).

**IV  Conclusion**

After a comprehensive review of the entire record supplied to the Court in this matter, including the forensic interviews of Bryce McLaughlin, and careful and thorough consideration of the pleadings submitted by counsel, the undersigned concludes that the state court's decision denying the claims raised by Petitioner in his federal habeas petition was neither contrary to, nor an unreasonable application of

federal law.  Petitioner's trial counsel's performance was not deficient and Petitioner was not prejudiced by any alleged deficiency, nor was Petitioner's right to due process of law violated in his criminal proceedings.

**IT IS THEREFORE RECOMMENDED** that Mr. Ward's Petition for Writ of Habeas Corpus be **denied.**

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment.

Pursuant to Rule 72(b), Federal Rules of Civil Procedure, the parties shall have ten (10) days from the date of service of a copy of this recommendation within which to file specific written objections with the Court.  Pursuant to Rule 7.2, Local Rules of Civil Procedure for the United States District Court for the District of Arizona, without the permission of the Court Petitioner's objections to the Report and Recommendation may not exceed seventeen (17) pages in length.  Thereafter, the parties have ten (10) days within which to file a response to the objections.

Failure to timely file objections to any factual or legal determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo appellate consideration of the issues.  See United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).  Failure to timely file objections to any factual or legal determinations of the

Magistrate Judge will constitute a waiver of a party's right to appellate review of the findings of fact and conclusions of law in an order or judgment entered pursuant to the recommendation of the Magistrate Judge.

DATED this 29th day of September, 2008.

_____
Mark E. Aspey
United States Magistrate Judge

-71-