**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sean Patrick Ward,<br><br>              Petitioner,<br><br>vs.<br><br>Dora P.   Schriro, Director, Arizona<br>Department of Corrections; Terry<br>Goddard, Attorney General,<br><br>              Respondents. | No.  CV 07-606-PCT-MHM<br><br>**ORDER** |

        Currently before the Court is Petitioner Sean Patrick Ward's Petition for Writ of Habeas Corpus by a Person in State Custody Pursuant to 28 U.S.C. § 2254, (Doc. 1), and Magistrate Judge Mark Aspey's Report and Recommendation. (Doc. 24). After reviewing the record and determining oral argument is unnecessary, the Court issues the following Order.

**I.      BACKGROUND**

        On March 19, 2007, Petitioner, through counsel, filed a petition seeking a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (Doc. 1). Respondents filed an Answer to Petition for Writ of Habeas Corpus ("Answer") on September 14, 2007.  (Doc. 13).  On December 7, 2007, Petitioner replied. (Doc. 23). Magistrate Judge Mark Aspey filed a Report  and  Recommendation  ("R&R")  on  September  30,  2008,  recommending  that Petitioner's habeas petition be denied in full. (Doc. 24). On December 1, 2008, Petitioner

1   filed his objections to the R&R, (Doc. 27), which Respondents replied to on May 19, 2009.

2   (Doc. 32).  The objections became fully briefed on June 15, 2009.  (Doc. 36).

3   The state level factual and procedural background of this case is extensively  and

4   thoroughly  detailed  with  citation  to  the  record   in  Section  I,  "Procedural  History,"  of

5   Magistrate Judge Aspey's R&R.  (Doc. 24, pp. 1–42).  It does not appear that the Petitioner

6   objects to the R&R's recitation of the facts, which includes detailed accounts of the evidence

7   and testimony brought forth at trial and at the Post Conviction Relief ("PCR") evidentiary

8   hearing.  Instead, he takes issue with Magistrate Judge Aspey's interpretation of those facts

9   as they pertain to his claims for relief.  This Court, therefore, fully incorporates by reference

10  Section I of the R&R into this Order, and which should be read in conjunction with this

11  Order.  It also notes that this case stems from an April 6, 2000, Mohave County, Arizona,

12  grand jury indictment that charged Petitioner with the first-degree murder of his ex-girlfriend

13  Ms. Kristine McLaughlin.  (Answer, Exh.  A1).  At trial, Petitioner was represented by

14  counsel; Mr.  Engan.  On Friday, March 16, 2001, the jury returned a verdict of guilt on the

15  offense of second degree murder.  (Id., Exh. A). On April 13, 2001, after a hearing, Petitioner

16  was sentenced to a term of 22 years imprisonment pursuant to this conviction.  (Id., Exh. R).

17  On April 17, 2001, Petitioner filed a timely notice of appeal from his judgment and

18  sentence.  (Id., Exh.  A). Petitioner was appointed counsel to represent him in his direct

19  appeal.  (Id.) Petitioner raised eleven issues, including a due process claim regarding the

20  prosecutor's closing arguments and the failure to video-tape the police station photo line-up

21  interview with the victim's son, Bryce McLaughlin.  (Id., Exh. S).  On September 26, 2002,

22  the Arizona Court of Appeals rejected all of Petitioner's claims and affirmed his conviction

23  and sentence in a memorandum decision.  (Id., Exh. V).   Petitioner sought review of the

24  decision by the Arizona Supreme Court, which was summarily denied on March 18, 2003.

25  (See Petition for Habeas Corpus, Doc.  1 at 2). Petitioner did not seek a writ of certiorari

26  from the United States Supreme Court.

27  On May 20, 2003, Petitioner initiated a timely action seeking state post-conviction

28  relief pursuant to Rule 32 of the Arizona Rules of Criminal Procedure.  In his action for

1   post-conviction relief Petitioner raised three general arguments, including an allegation that

2   his trial counsel was unconstitutionally ineffective. (Answer, Exh. W). The Mohave County

3   Superior Court found that Petitioner's ineffective assistance of counsel claim was colorable

4   and conducted an evidentiary hearing regarding Petitioner's claims on April 23, 2004. (Id.,

5   Exh. A).  On May 17, 2004, the trial court issued a lengthy order denying post-conviction

6   relief.  (Id.).  Petitioner filed a timely petition for review with the Arizona Court of Appeals.

7   (Id., Exh. C).  On October 17, 2005, the Arizona Court of Appeals summarily denied review

8   of the trial court's denial of relief.  (Id., Exh. AA).  Petitioner sought review of this decision

9   by the Arizona Supreme Court, which was denied on May 25, 2006. (Id., Exh.  BB).

10  **II.     STANDARD OF REVIEW**

11       A district court must review the legal analysis in a Magistrate Judge's Report and

12  Recommendation *de novo*.  See 28 U.S.C. § 636(b)(1)(C).  In addition, a district court must

13  review the factual analysis in the Report and Recommendation *de novo* for those facts to

14  which objections are filed.  See United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir.

15  2003) (en banc); see also 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de

16  novo determination of those portions of the report or specified proposed findings or

17  recommendations to which objection is made.").   "Failure to object to a magistrate judge's

18  recommendation waives all objections to the judge's findings of fact."  Jones v. Wood, 207

19  F.3d 557, 562 n. 2 (9th Cir. 2000).

20       Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a

21  federal court "shall not" grant habeas relief with respect to "any claim that was adjudicated

22  on the merits in state court proceedings" unless the state court decision was (1) contrary to,

23  or an unreasonable application of, clearly established federal law as determined by the U.S.

24  Supreme Court, or (2) based on an unreasonable determination of the facts in light of the

25  evidence presented in the state court proceedings.  28 U.S.C. § 2254(d); see Williams v.

26  Taylor, 529 U.S. 362, 412-13 (2000).  A state court's decision is "contrary to" clearly

27  established precedent if (1) "the state court applies a rule that contradicts the governing law

28  set forth in [Supreme Court] cases," or (2) "if the state court confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent." <u>Taylor</u>, 529 U.S. at 405-06. "A state court's decision can involve an 'unreasonable application' of federal law if it either correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." <u>Hernandez v. Small</u>, 282 F.3d 1132, 1142 (9th Cir. 2002). Thus, a state court's application of federal law must be more than incorrect or erroneous, it must be objectively unreasonable. <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003). Furthermore, "[w]hen applying these standards, the federal court should review the 'last reasoned decision' by a state court." <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir. 2004).

## III.   EXHAUSTION

The Petition for Writ of Habeas Corpus makes two overarching legal claims: (1) ineffective assistance of counsel; and (2) violation of due process. Before addressing the merits of Petitioner's claims, however, the Court must consider Respondents' allegations concerning exhaustion. In their Answer, Respondents argued that Petitioner did not properly exhaust three of his instant claims. These are: (1) ineffective assistance of counsel ("IAC") predicated on trial counsel's failure to interview and call two potential alibi witnesses, Yvonne Johnson and Philip Enoch; (2) IAC predicated on trial counsel's failure to discover and present evidence regarding the lack of motor oil outside of Ms. McLaughlin's residence; and (3) IAC predicated on trial counsel's closing argument. (Doc. 13 at 54–55). In his Reply, Petitioner admitted that he did not properly exhaust the ineffectiveness claim concerning trial counsel Engan's failure to interview Yvonne Johnson and Philip Enoch, but argued that the other two claims identified by Respondents are fully exhausted and properly before this Court. Magistrate Judge Aspey did not address Respondents' exhaustion arguments in his R&R, which Respondents pointed out in their response to Petitioner's objections. (Doc. 32, p.2, n.1). Accordingly, because Respondents have renewed their

1    exhaustion arguments, this Court will consider them now.  (Id.).

2        **A.    Legal Standard**

3        Under 28 U.S.C. § 2254(b)(1) a federal court can only consider a petitioner's writ of

4    habeas corpus after the petitioner exhausts all available state remedies.  Coleman v.

5    Thompson, 501 U.S. 722, 731 (1991).  " Exhaustion requires the state prisoner give the state

6    courts a 'fair opportunity to act' on each of his claims before he presents those claims in a

7    federal habeas petition."  Kelly v. Small, 315 F.3d 1063, 1066 (9th Cir. 2002) (quoting

8    O'Sullivan v. Boerckel, 526 U.S. 838, 844 (1999)). A claim is fairly presented if the

9    petitioner described both the operative facts and the legal theory on which his claim is based

10   to the appropriate state court. Tamalini v. Stewart, 249 F.3d 895, 898 (9th Cir. 2001).   With

11   the exception of death penalty cases, an Arizona prisoner exhausts his state remedies by

12   fairly presenting his claims to the Arizona Court of Appeals. See, e.g., Castillo v. McFadden,

13   399 F.3d 993, 999 (9th Cir. 2004) ("To exhaust his Arizona remedies, Castillo had to give

14   the Arizona courts a 'fair opportunity' to act on his federal due process claim before

15   presenting it to the federal courts. . . . We consider Castillo's briefing to the Arizona Court

16   of Appeals to determine whether he fairly presented his federal due process claim to the

17   Arizona courts.") (citations omitted); Swoops v. Sublett, 196 F.3d 1008, 1010 (9th Cir. 1999)

18   ("Arizona has declared that its complete round [of appellate review] does not include

19   discretionary review before the Arizona Supreme Court.").

20       **B.    Discussion**

21           **1.    IAC Based on Engan's Closing Argument**

22       The Court turns first to Respondents' argument that Petitioner failed to exhaust his

23   ineffective assistance of counsel claim predicated on Engan's closing argument.  Petitioner

24   alleges that Engan performed ineffectively during his closing argument by both undermining

25   his suicide and third-party murderer defenses, and by bolstering the state's case by referring

26   to irrelevant and prejudicial evidence introduced by the prosecution.  The Parties agree that

27   Petitioner properly exhausted a claim for IAC based on Mr.  Engan's closing argument.

28   Instead, they dispute whether the claim that Petitioner exhausted is based on the same

1  underlying facts as the claim presented in the instant habeas petition.  This is an important
2  distinction; Petitioner fairly presented his claim in state court only if the state court claim
3  described both the same set of operative facts, in addition to the applicable law.  <u>Tamalini</u>
4  <u>v. Stewart</u>, 249 F.3d 895, 898 (9th Cir. 2001).

5          Petitioner first raised an IAC claim based on Engan's closing argument in his Petition
6  for Post-Conviction Relief.   Petitioner argued that Engan performed ineffectively by
7  "fail[ing] to argue vital evidence that had been presented at trial in support of his defense of
8  suicide, accident or third party."  (Answer, Exh. W at 26).  In support of this claim, Petitioner
9  highlighted numerous examples of evidence and trial testimony elicited during trial and that
10 supported a suicide theory, but which Engan failed to argue during his closing.  Specifically,
11 Petitioner noted that Engan did not mention Dr.  Keen's testimony that a person could cut
12 off their air supply, pass out, and die, but still not evidence neck trauma, and that such a
13 death would be consistent with Dr. Nelson's findings and testimony concerning the pristine
14 condition of McLaughlin's neck.  He also claimed that Engan failed to argue any evidence
15 that disputed Dr.  Keen's conclusion of homicide, noting that Engan failed to remind the jury
16 of Dr.  Keen's admission that he did not examine certain of McLaughlin's neck tissues and
17 of Dr.  Keen's statement that he did not believe the bruises he found on McLaughlin's hands
18 and arms were defensive bruises.  Finally, Petitioner also argued that Engan failed to tell the
19 jury that the ovoid bruises on McLaughlin's front left scalp area could have been caused by
20 the Buzz Lightyear doll found next to her body, and that other evidence found at the scene,
21 such as the green box, supported a suicide theory.

22         In his Petition for Review to the Arizona Court of Appeals, Petitioner also made
23 reference to Engan's allegedly ineffective closing argument, although not explicitly.  As part
24 of his argument that Engan fundamentally misunderstood the crime scene because he failed
25 to consult with a crime scene or medical examiner, Petitioner cited Engan's closing
26 argument, suggesting it evidenced this misunderstanding.  (Answer, Exh.  Z at 5–6).  The
27 only other mention of Plaintiff's closing argument is found under the heading: "Counsel was
28 ineffective by failing to present autopsy photos and evidence to rebut the State's theory that

1   DNA under Kristine's fingernails was the result of her clawing at the rope around her neck

2   during hanging proving a violent and prolonged death." (Id. at 11). Petitioner noted that the

3   prosecutor, during his closing, argued that the DNA under McLaughlin's fingernail proved

4   that she scratched at the roper around her neck and suffered a painful death, and that Engan

5   failed to rebut this evidence during his closing argument.  (Id.).

6          The evidence on which Petitioner currently rests his IAC claim is very different from

7   that presented in state court.  In his instant Petition for Writ of Habeas Corpus, Petitioner

8   argues that Engan performed ineffectively during closing by mentioning prosecution

9   evidence that painted Petitioner in a bad light, such as Petitioner's conviction for drug

10  possession and proclivity for non-traditional sexual practices, such as anal sex.  He also

11  points out that Engan undercut his own theory of the case by explaining to jurors that the

12  state would likely characterize his two-hook suicide theory as "preposterous," and by stating

13  "I don't know who killed her.  Frankly, that's not my business.  I am not here to tell you

14  that," which, Petitioner argues, discredited the suicide theory, while simultaneously implying

15  McLaughlin's death was, as the prosecution contended, a murder, not a suicide.    Finally,

16  Petitioner argues that Engan bolstered the prosecution's case by: (1) stating that Bryce

17  McLaughlin was "not dumb," and a "pretty smart kid;" (2) noting that Petitioner had been

18  indicted by the grand jury and, therefore, "Someone thinks he is guilty;" and (3) vouching

19  for the intelligence and knowledge of the prosecutor and the police, making the statement,

20  "[the prosecutor and the police] probably know more about this case than I do.  They have

21  lived with this case almost a year."

22          The claim Petitioner pressed in state court is similar to the one presented in

23  Petitioner's federal habeas petition only to the extent that both allege ineffective performance

24  by Engan during closing argument.  The fact, however, that both claims share a general legal

25  theory does not give Petitioner license to rely on a completely different set of operative facts

26  in federal court.  See Beaty v. Stewart, 303 F.3d 975, 989 (9th Cir. 2002) (finding conflict

27  of interest claim unexhausted where the conflict on which the petitioner based his claim

28  changed from state court to federal court ).  It is well-established that "in order to fulfill

- 7 -

1   exhaustion requirements, a petitioner must present to the state courts the substantial

2   equivalent of the claim presented in federal court."  Lopez v. Schriro, 491 F.3d 1029, 1040

3   (9th Cir. 2007).  "However, a petitioner may provide further facts to support a claim in

4   federal district court, so long as those facts do not 'fundamentally alter the legal claim

5   already considered by the state courts.'"  Id.  (citing Vasquez v. Hillery, 474 U.S. 254, 260

6   (1986)).  Accordingly, Petitioner argues that his claim is exhausted because his instant

7   petition does nothing more than "provid[e] a slightly different or more detailed explanation

8   of Engan's failures on closing argument."  The Court does not agree.

9       In state court, Petitioner claimed that Engan performed ineffectively because he

10  failed to argue trial evidence that supported Engan's theory of suicide, accident, or third

11  party.  To factually support this argument, Petitioner pointed to potentially exculpatory

12  testimony and evidence presented at trial that was not mentioned by Engan during his

13  closing. In his federal habeas petition, Petitioner argues that Engan performed ineffectively

14  during closing because he spent significant time discussing "inconsequential facts and

15  evidence" that painted Petitioner in a bad light and undercut his own case in a number of

16  different ways.  To support of this claim, Petitioner relies namely on a number of statements

17  Engan made during closing argument.    In other words, Petitioner previously based his

18  allegation of ineffective performance on what Engan did not say during closing.  Now,

19  however, Petitioner asks this Court to find Engan performed unreasonably based on what he

20  did say. None of the statements on which Petitioner now relies, however, were brought to the

21  state courts' attention.

22      Accordingly, it does not appear to the Court that petitioner has presented a

23  substantially similar claim to the one he presented at state court.   Although Petitioner makes

24  the same general legal claim, the facts he has marshaled to support that argument have

25  fundamentally altered its character.  And these do not, as Petitioner suggests, merely place

26  his state claim in a stronger evidentiary posture or add greater specificity to the factual

27  allegations, as none is remotely related to Engan's failure to bring trial evidence to the jury's

28  attention that supported his defense theories.  Instead these facts lead towards a different

conclusion—the one strongly suggested in the Petition—that Engan performed ineffectively during closing because he highlighted prejudicial information and otherwise bolstered the prosecutions case.   This allegation, however, is neither made nor even suggested in Petitioner's state court petitions, and as the Court has already mentioned, the facts that underpin this allegations are nowhere to be found either.   Cf. Lopez v. Schriro, 491 F.3d 1029, 1040 (9th Cir. 2007) (finding petitioner exhausted his state remedy where he "at least ma[de] the general allegations of his counsel's lack of penalty phase preparation to the Arizona Supreme Court (including improper delegation to an inexperienced subordinate and failure to prepare mental health experts)").   The Arizona State courts, therefore, were not afforded a meaningful opportunity to consider this allegation of legal error.   See Casey v. Moore, 386 F.3d 896, 916 (9th Cir. 2004), and this Court must find that Petitioner has not exhausted his IAC claim predicated on Engan's closing argument.

**2.   IAC based on Engan's Failure to Discover the Lack of Motor Oil**

Respondents also argue that Petitioner's did not fully exhaust his IAC claim predicated on Engan's failure to discover and present evidence regarding the lack of motor oil outside of Ms. McLaughlin's residence.   The record shows that Petitioner referenced Engan's failure to discover the lack of motor oil in his Petition for Post-Conviction Relief as part of his argument that Engan failed to properly investigate facts which would support an alibi defense.   Petitioner argued, as he does here, that Engan failed to investigate Petitioner's Pinto to confirm the presence of an oil leak, and that the crime scene photos and video did not show the presence of any new oil leaks, just some older stains that appear to have been washed, suggesting Petitioner did not go to McLaughlin's house on the night of the murder.   (Exh. X, pp.9–10).   Petitioner's Petition for Review to the Arizona Court of Appeal, however, is devoid of any mention of this claim or, for that matter, any other claim based on Engan's failure to investigate and pursue potential alibi evidence.   Instead, in the Petition, Petitioner made only a general allegation that "Egan was Ineffective by Failing to Investigate the Scene and Present a Clearly Viable Suicide or Accident Defense in a Hanging Case Where the Physical Evidence was Inconsistent with the Child Eye-Witness Testimony

1  and Verdict," followed by seven specific allegation of ineffectiveness focused on Engan's

2  failure to investigate and, therefore, understand evidence inside McLaughlin's home and in

3  direct proximity to the scene of the hanging.

4          In arguing that he fully exhausted this claim, Petitioner's asserts only that he has

5  exhausted claims that Engan was ineffective in failing to investigate the physical evidence.

6  The issue, however, is not if Petitioner exhausted some claims based on Engan's failure to

7  investigate physical evidence, which he has, but if he exhausted this particular claim, which

8  he has not.  Quite simply, Petitioner did not mention the oil leak in his Petition for Review

9  to the Arizona Court of Appeals.  And, while a petitioner may provide "further facts to

10  support a claim in federal district court,"  the oil spill is unrelated to the other investigation

11  claims made by Petitioner in state court, all of which focus on Engan's failure to investigate

12  and understand physical evidence found at the scene of the crime.  <u>Lopez</u>, 491 F.3d at 1040.

13  Instead, the oil spill evidence clearly goes towards Engan's failure to investigate potential

14  alibi claims.  Petitioner, however, has not exhausted any claims alleging IAC based on

15  Engan's failure to investigate potential alibi evidence.  <u>Lopez</u>, 491 F.3d at 1040.  Petitioner

16  had an opportunity to present this claim to the Arizona Court of Appeals, but failed to do so.

17  Accordingly any claim predicated on Engan's failure to investigate alibi evidence in the form

18  of the oil leak is not exhausted.

19          **C.      Procedural Default**

20          Having determined that two of Petitioner's claims are not exhausted, the Court must

21  now consider whether they are procedurally defaulted as well.

22                  **1.      Legal Standard**

23           If a petition contains claims that were not fairly presented in state court, then the

24  federal court must determine whether any state remedies remain available to the petitioner.

25  <u>See</u> <u>Harris v. Reed</u>, 489 U.S. 255, 268-70 (1989) (O'Connor, J., concurring); <u>Rose v. Lundy</u>,

26  455 U.S. 509, 519-20 (1982).  If remedies are still available in state court, the federal court

27  may dismiss the petition without prejudice pending the exhaustion of the state remedies.

28  <u>Rose</u>, 455 U.S. at 520.  However, if the Court finds that the petitioner no longer has state

1   remedies available, his claims are procedurally defaulted and must be dismissed with

2   prejudice unless petitioner can show a miscarriage of justice, cause and prejudice, or actual

3   innocence that would excuse the default.  Teague v. Lane, 489 U.S. 288, 298-99 (1989);

4   Sandgathe v. Maass, 314 F.3d 371, 376 (9th Cir. 2002).  The standard for "cause and

5   prejudice" is one of discretion and is intended to be flexible and yielding to exceptional

6   circumstances only.  See Hughes v. Id.State Board of Corrections, 800 F.2d 905, 909 (9th

7   Cir. 1986).  Although both cause and prejudice must be shown to excuse a procedural

8   default, the Court need not examine the existence of prejudice if the petitioner fails to

9   establish cause.  See Engle v. Isaac, 456 U.S. 107, 134 n.43 (1982); Thomas, 945 F.2d at

10   1123 n.10.  Status as an inmate and lack of legal knowledge do not constitute cause for

11   failure to present claims to state courts.  Tacho v. Martinez, 862 F.2d 1376, 1381 (9th Cir.

12   1988)(finding that petitioner's arguments concerning his mental health and reliance upon

13   jailhouse lawyers did not constitute cause); Hughes, 800 F.2d at 909 (9th Cir. 1986) (finding

14   that illiterate *pro se* petitioner's lack of legal assistance did not amount to cause to excuse a

15   procedural default).  Failure to establish cause may be excused "in an extraordinary case,

16   where a constitutional violation has probably resulted in the conviction of one who is actually

17   innocent."  See Murray v. Carrier, 477 U.S. 478, 496 (1986).

18           **2.     Discussion**

19           Arizona Rule of Criminal Procedure 32 bars a petitioner who has already filed a direct

20   appeal and had a full round of post-conviction relief proceedings from re-raising claims in

21   a subsequent petition that could have been raised in the first one.  Ariz.  R.  Crim P.

22   32.2(a)(3) ("A defendant shall be precluded from relief under this rule based upon any

23   ground: that has been waived at trial, on appeal, or in any previous collateral proceeding.").

24   The Arizona Supreme Court has interpreted this rule to bar a petitioner from raising claims

25   in a subsequent petition for post-conviction relief that could have been raised in a first such

26   petition, but were not.  See Krone v. Hotham, 181 Ariz. 364, 366 (Ariz. 1995) ( "Thus, if a

27   defendant's early petition for post-conviction relief raises a limited number of issues, the

28   defendant waives other issues he could have then raised but did not.").  Petitioner's claims

1    are procedurally defaulted, as he does not have any available remedies left at state court,

2    having already enjoyed a full round of post-conviction relief proceedings.

3         Having determined Petitioner has no remaining state court remedies, the Court must

4    consider whether Petitioner can demonstrate a miscarriage of justice,  cause and prejudice,

5    or  actual innocence that would excuse the default.  Because Petitioner bares the burden of

6    making such a showing and has argued only that his claims are properly exhausted, not

7    addressing procedural default, the Court must find that Petitioner has failed to establish that

8    his claims should be permitted to move forward despite the procedural default.  Sandgathe,

9    314 F.3d at 376.

10   **IV.     PETITIONER'S CLAIMS FOR INEFFECTIVE ASSISTANCE OF COUNSEL**

11        Based on the headings in his Petition for Habeas Corpus, Petitioner only made three

12   IAC claims: (1) failure to hire an investigator; (2) deficient examination of  both his and the

13   State's  medical  expert  with  regards  to  the  condition  of  McLaughlin's  neck;  and  (3)

14   ineffective performance during closing.  (Doc.  1 at 27, 36, 45).  In light of the Court's

15   determinations concerning exhaustion and procedural default, only the former two claims

16   remain.  Within each of these IAC claims, however, Petitioner has a tendency to make

17   additional allegations of IAC that are distinct from the one claimed in the section heading.

18   This presents a challenge for the Court, as it must divine what exactly is the conduct, or

19   absence of conduct, that constitutes the deficient performance.  Accordingly, despite the fact

20   that Petitioner appears to only have two IAC claims remaining, the Court finds there are in

21   fact six, and will discuss them each separately.

22        Additionally, in his objections to the R&R, Petitioner alleges that Magistrate Judge

23   Aspey correctly cited, but failed to apply the legal standard for ineffective assistance of

24   counsel to his claims.   Specifically, Petitioner criticizes the R&R for focusing on the

25   sufficiency of the evidence as a metric for whether Engan provided effective assistance of

26   counsel.  In light of Petitioner's concerns about the application of the ineffectiveness

27   standard, which appear to have some merit, this Court will not merely review the legal

28   conclusions in the R&R de novo, see 28 U.S.C. § 636(b)(1)(c), but instead conduct its own

1    independent analysis of Petitioner's claims.

2         **A.    Legal Standard**

3         The right to counsel guaranteed to criminal defendants by the Sixth Amendment "is

4    the right to the effective assistance of counsel."  Lord v. Wood, 184 F.3d 1083, 1085 (9th

5    Cir. 1999) (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)). The two-prong

6    test for establishing ineffective assistance of counsel was set forth by the Supreme Court in

7    Strickland v. Washington, 466 U.S. 668 (1984). To prevail on an ineffectiveness claim, a

8    defendant must show (1) that counsel's representation fell below an objective standard of

9    reasonableness, (2) that "there is a reasonable probability that, but for counsel's

10   unprofessional errors, the result of the proceeding would have been different." Id. at 687-88;

11   Franklin v. Johnson, 290 F.3d 1223, 1237 (9th Cir. 2002).

12        In reviewing trial counsel's performance, "a court must indulge a strong presumption

13   that counsel's conduct falls within the wide range of reasonable professional assistance; that

14   is, the defendant must overcome the presumption that, under the circumstances, the

15   challenged action might be considered sound trial strategy.  Id. at 689 (internal quotation

16   omitted).  A court may not engage in hindsight analysis, but instead must "evaluate the

17   conduct from counsel's perspective at the time."  Id.  As the Ninth Circuit has artfully

18   explained: "The test has nothing to do with what the best lawyers would have done. Nor is

19   the test even what most good lawyers would have done. We ask only whether some

20   reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted

21   at trial." Coleman v. Calderon, 150 F.3d 1105, 1113 (9th Cir. 1998), rev'd on other grounds,

22   525 U.S. 141 (1998).[1]

23

24        [1] In their papers, Respondents argue that relief based on an ineffectiveness theory is
25   precluded by the fact that Engan did not testify at the evidentiary hearing.  In making their
     argument, Respondents have not cited to, and this Court is unaware of, any authority that
26   supports such a categorical rule.  Petitioner, on the other hand, has cited authority that
     affirmatively demonstrates an IAC claim can proceed, and even succeed, without the
27   testimony of trial counsel.  See, e.g., Hamblin v. Mitchell,354 F.3d 482, 492 (6th Cir. 2003)
28   (finding ineffective assistance based on a failure to investigate despite the lack of testimony

1    If a defendant proves deficient performance, he must still show prejudice.  <u>See</u>

2    <u>Strickland</u>, 466 U.S. at 691–92.  To establish prejudice, a prisoner must demonstrate a

3    "reasonable probability that, but for counsel's unprofessional errors, the result of the

4    proceedings would have been different." <u>Id.</u> at 694.  A "reasonable probability" is "a

5    probability sufficient to undermine confidence in the outcome." <u>Id.</u>

6    **B.    IAC:  Failure to Investigate**

7    Petitioner argues that Engan performed ineffectively by (1) failing to hire an

8    investigator; and (2) failing to adequately investigate potentially exculpatory evidence.

9    Failure to investigate can constitute ineffective assistance of counsel.  The Sixth Amendment

10   imposes on "[c]ounsel [] a duty to make reasonable investigations or to make a reasonable

11   decision that makes particular investigations unnecessary."  <u>Strickland</u>, 466 U.S. at. 691.

12   Counsel has performed ineffectively "where he neither conducted a reasonable investigation

13   nor made a showing of strategic reasons for failing to do so."  <u>Avila v. Galaza</u>, 297 F.3d 911,

14   918-919 (9th Cir. 2002) (quoting <u>Sanders v. Ratelle</u>, 21 F.3d 1446, 1456 (9th Cir. 1994)).

15   Still, as with all other IAC claims, "[a] particular decision not to investigate must be directly

16   assessed for reasonableness in all the circumstances, applying a heavy measure of deference

17   to counsel's judgments."  <u>Strickland</u>, 466 U.S. at.  691.

18   **1.    Failure to hire an investigator**

19   As a preliminary matter, the Court must reject Petitioner's theory that Engan

20

21   from trial counsel at the PCR hearing); <u>Henry v. Scully</u>, 918 F. Supp. 693, 714-15 (S.D.N.Y.
     1995) (finding that counsel's decision to not object must be examined as to whether it was
22   within the constitutional boundaries of reasonable competence, where counsel was deceased
23   and could not testify as to his reasons for not objecting).  The effect of bringing an
     ineffectiveness claim without the benefit of trial counsel's testimony, however, is not de
24   minimis.  The Supreme Court has explained that the presumption that counsel performed
25   effectively "*has particular force* where a petitioner bases his ineffective-assistance claim
     solely on the trial record, creating a situation in which a court 'may have no way of knowing
26   whether a seemingly unusual or misguided action by counsel had a sound strategic motive.'"
27   <u>Yarborough</u>, 540 U.S. at 8 (emphasis added) (quoting <u>Massaro v. United States</u>, 538 U.S.
     500, 505, 123 S.Ct. 1690 (2003).  Accordingly, while the absence of Engan's testimony may
28   turn out to be consequential, it is not per se determinative.

1    performed ineffectively by not hiring an investigator or for requesting funds for a court-
2    appointed investigator.   Given the gravity of the charges against Petitioner—first degree
3    murder—the Court agrees that hiring an investigator was probably the most prudent course
4    of action.   The problem with Petitioner's argument, however, is that he conflates Engan's
5    failure to hire an investigator with Engan's alleged failure to investigate.   The two are not
6    identical.  Investigation is not the sole province of professional investigators.   Undoubtedly,
7    in many instances, a lawyer can conduct an investigation that satisfies the requirements of
8    the Sixth Amendment without the aid of a hired investigator.  And while it is conceivable that
9    certain cases might be so complex that counsel's failure to hire an investigator would be per
10   se ineffective, Petitioner has not explained why this case fits that mold, and nothing in the
11   record suggests that Engan could not have investigated the physical evidence at the crime
12   scene on his own.  Iinstead, the real issue appears to be that Engan chose not to undertake
13   such an investigation at all.   His failure to hire an investigator, therefore, was merely a
14   symptom of his failure to investigate, not its cause.  Petitioner has not, as a result, overcome
15   the presumption of effectiveness to which Engan's decision not to hire an investigator is
16   entitled.  Accordingly, the state court's decision, which likewise recognized that "foregoing
17   the use of an investigator and doing one's own investigation, even in a first degree murder
18   case, is [not] in an of itself a deficient performance failing to meet prevailing professional
19   standards," was not an unreasonable application of law.

20                      **2.        Failure to investigate the crime scene**

21        The Court turns next to Petitioner's claims that Engan's performed deficiently by
22   failing to conduct a sufficient investigation of the crime scene.  Specifically, Petitioner faults
23   Engan for failing to investigate, or for failing to hire an investigator to investigate, forensic
24   evidence a Buzz Lightyear doll and green box found in the vicinity of McLaughlin's body,
25   and a pair of scissors left sitting on a counter in McLaughlin's kitchen.

26        At the PCR evidentiary  hearing, Steven W.  Bernard, an investigator hired by
27   Petitioner, testified that Engan should have investigated these particular objects because that
28   investigation may have uncovered evidence that supported a suicide theory.  (Answer, Exh.

1   Y at 75–77).  Bernard stated that because the police initially suspected suicide, he would

2   have tested the green box found next to McLaughlin's head for footprints and fingerprints.

3   (Id. at 76).  He explained that the presence of McLaughlin's footprints on the box would have

4   suggested that McLaughlin stood on top of the box and put the rope on the hook herself.

5   (Id.).  Bernard also stated that he would have tested the Buzz Lightyear doll for tissue and

6   DNA.  (Id.).  He explained that the ovoid bruises found on McLaughlin's head could have

7   been postmortem, as it appeared to him that the feet of the Buzz Lightyear doll were the same

8   shape as the bruises and may have, therefore, caused them.  (Id.).   Similarly, Bernard also

9   testified that the Buzz Lightyear doll may  have been the cause of the wound found just

10  below McLaughlin's knee.  (Id. at 77).  Finally, Bernard mentioned the scissors on the

11  kitchen counter, but did not explain why he would have tested them.  (Id.).

12          Although the Court finds disconcerting Engan's failure to investigate the crime scene

13  evidence highlighted by Bernard, it need not consider whether Engan's failure to do so

14  constitutes deficient performance, as assuming, without deciding, that Engan performed

15  unreasonably, Petitioner cannot prove prejudice.  The prejudice caused by a failure to

16  investigate is not based on the lack of an investigation itself, but instead results from trial

17  counsel's inability to introduce the helpful evidence that the investigation would have

18  uncovered.  See Avila v. Galaza, 297 F.3d 911, 919 (9th Cir. 2002) ("We have repeatedly

19  found that a lawyer who fails adequately to investigate, *and to introduce into evidence*,

20  [evidence] that demonstrates his client's factual innocence, or that raises sufficient doubt as

21  to that question to undermine confidence in the verdict, renders deficient performance."

22  (emphasis added, and internal quotation omitted); Lord v. Wood, 184 F.3d 1083, 1093 (9th

23  Cir. 1999) (same).  That a court's analysis of the prejudice prong of an investigation-based

24  ineffectiveness claim must focus on the evidence that an investigation would have uncovered,

25  as opposed to the investigation itself, makes perfect sense; if a particular investigation would

26  not have turned up beneficial evidence, a petitioner, or for that matter a jury, can not be said

27  to have been deprived of the benefit of that investigation.

28          In line with this principle, the Ninth Circuit has held that courts may not find prejudice

1    based on speculation about what evidence an investigation might have turned up.  Grisby v.

2    Blodgett, 130 F.3d.  365, 371 (9th Cir.  1997); see Hendricks v. Calderon, 70 F.3d 1032,

3    1042 (9th Cir. 1995) ("Absent an account of what beneficial evidence investigation into any

4    of these issues *would have* turned up, Hendricks cannot meet the prejudice prong of the

5    Strickland test."  (emphasis added)); McBride v. Sharpe, 25 F.3d 962, 973 (11th Cir. 1994)

6    ("McBride's unsupported assertions about what further investigation of the medical report

7    and automobile *could have revealed* do not establish a reasonable probability that the result

8    of his trial would have been different."(emphasis added)).  In Grisby, the petitioner argued

9    that his counsel performed ineffectively for failing to pursue testing of a carpet, "the results

10   of [which] might have exculpated him by showing that his blood was not present in the

11   hallway, a fact that would make it unlikely that he was [the]  assailant."  Id.  at 372.  In

12   finding that the petitioner could not demonstrate prejudice, the Ninth Circuit relied on the

13   fact that "[petitioner] cannot now show that the results of the test would have been in his

14   favor, the carpet having long since been destroyed," labeling his argument a "speculative

15   claim of prejudice."  Id.  at 373.

16       Like in Grisby, Petitioner's prejudice argument is predicated on speculation.

17   Although due to no fault of his own, Bernard testified only as to what a proper investigation

18   might have uncovered.[2]   For example, Bernard noted only the "possibility*"* that

19   McLaughlin's footprints would be found on top of the green box.  (Answer, Exh. Y at 76).

20    Similarly, he stated that "it appears to me that the Buzz Light year *may* have been the cause

21   of the ovoid bruises on her head which, in my opinion, *could have been* postmortem."  (Id.)

22   (emphasis added).  Bernard offered no explanation at all as to what evidence the scissors

23   might have produced. While it is certainly possible testing of these objects would have turned

24   up evidence that benefitted Petitioner, it is far from certain.  As in Grisby, this lack of

25   certainty prevents the Court from being able to find prejudice, even assuming Engan

26

27           [2]Petitioner has not been able to conduct the tests suggested by Bernard, as the relevant

28   evidence has been destroyed.

1    performed ineffectively by not conducting the investigation.  Accordingly, the state court's

2    determination that Petitioner was not prejudiced by Engan's alleged failure to conduct a

3    proper investigation of the crime scene evidence is not an unreasonable application of law.

4                          **3.      Failure to Request 911 Tape**

5            Petitioner also argues that Engan performed ineffectively by failing to request the

6    tapes of the two 9-1-1 calls made by Tim Koonce, from the scene of the crime, after he

7    discovered McLaughlin's body.   Petitioner argues this claim under the umbrella of his

8    investigation theory of IAC.  In other words, he cites the fact that Engan did not request the

9    911 tapes as evidence of Engan's failure to conduct an adequate investigation.

10           Once again, even if Petitioner could demonstrate deficient performance, his claim

11   would not succeed, as he cannot meet his burden concerning  prejudice.  Petitioner argues

12   that Engan's failure to request the 9-1-1 tapes "depriv[ed] the jury of hearing the initial call

13   and 'possible suicide' comments or any other information that could have been gleaned from

14   it." This argument is not persuasive.  Because the 9-1-1 tapes have been destroyed, no one

15   will ever know what "other information" could have been gleaned from them, and

16   speculation as to what the tape may have contained is insufficient to demonstrate prejudice.

17   Grisby, 130 F.3d. at 371.  It is not speculation, however, that Koonce reported a possible

18   suicide in his first 9-1-1 call, but changed his opinion to possible homicide in a second.

19   (Answer, Exh.  Y at 62–63.)   Even if the jury had heard this evidence, the Court does not

20   find it reasonably probable that the outcome of Petitioner's trial would have been different.

21           At the evidentiary hearing, Koonce explained that he changed his mind about the

22   cause of McLaughlin's death between the first and second 9-1-1 calls—from possible

23   suicide, to possible homicide—because of the position of McLaughlin's body and the size

24   of the rope.  (Id. at 63).  Koonce could not reconcile the length of the rope around

25   McLaughlin's neck with McLaughlin having hung herself—i.e. the rope appears too long to

26   have permitted McLaughlin's feet to leave the ground.  (Id.).  In his habeas petition, relying

27   on the evidentiary hearing testimony of Dr.  Peters, Petitioner argues that the length of the

28   rope does not, in fact, preclude a suicide theory, as people sometimes commit suicide by

hanging themselves even while their feet can touch the ground. That fact, however, does not render Koonce's explanation for his change of opinion unreasonable. To the contrary, upon encountering a dead woman lying on the ground, under a hook, with a rope around her neck, one would expect the 9-1-1 call of a first responder to make reference to possible suicide. That Koonce, a policeman, changed his mind about the possible cause of death after further examining the scene and discovering that the rope around McLaughlin's neck appeared too long to permit hanging seems perfectly plausible. Additionally, such an explanation would have appeared all the more reasonable to the jury given Engan's two-hook suicide theory, which appears to have been an attempt to explain how McLaughlin could have hung herself despite the length of the rope.

The Court doubts, therefore, that the jury would have ascribed any special significance to Koonce's initial determination of a possible suicide. Instead, the Court agrees with the state court that the 9-1-1 tape, had it been procured, would have been of "marginal value." (Answer, Exh. Z at 38). This evidence, therefore, does not undermine the Court's confidence in the outcome of Petitioner's trial and, as a result, it cannot find that Engan's failure to procure and introduce the 9-1-1 tapes caused Petitioner prejudice. Petitioner IAC claim based on Engan's failure to request the 9-1-1 tape is denied; the state court's decision that Engan was not ineffective for failing to get the 911 tapes was not an unreasonable application of law.

**C.     IAC: Failure to Adequately Elicit Testimony That Supported a Suicide Defense.**

Petitioner argues that Engan performed ineffectively by failing to elicit testimony from both his medical expert, Dr. Nelson, and the prosecution's medical expert, Dr. Keen, that supported a suicide theory. Specifically, Petitioner asserts that Engan's examination of these witnesses did not sufficiently emphasize the condition of McLaughlin's neck, which did not exhibit any signs of violent strangulation. Given the fact that Drs. Keen and Nelson disagreed on the manner of death, Petitioner argues that Engan's failure to bring forth testimony concerning the condition of McLaughlin's neck constitutes ineffective assistance

of counsel, as such testimony would have bolstered a suicide theory and discredited Keen's finding of homicide.

Dr. Nelson conducted the first autopsy on McLaughlin's body. He performed a complete neck dissection and found no cracks or fractures in any of the bones or vertebrae. Additionally, his examination uncovered found no soft tissue damage that would have been indicative of a violent or forced death. Dr. Keen examined the body after Dr. Nelson, but did not have access to the neck organs that had been removed by Dr. Nelson during his examination—the thyroid, cartilage, the hyoid bone, and the upper trachea. Petitioner argues that Dr. Keen's failure to examine these neck organs severely undermined his conclusion that McLaughlin's death was a homicide. In support of this position, he points to the PCR evidentiary-hearing testimony of Pima County medical examiner, Dr. Peters. (Answer, Exh. Y at 9–55). At that hearing, Dr. Peters, based on his examination of the autopsy reports, photographs of McLaughlin's neck, and other data, testified that he too could not determine the manner of death. He also stated, however, that nothing in the photographs suggested a forced strangulation and that the relatively pristine condition of McLaughlin's neck was more consistent with a suicide than not.

Petitioner criticizes Engan's failure to sufficiently explore the topic of McLaughlin's neck with Dr. Keen, noting that Engan asked Dr. Keen only a single question about the condition of McLaughlin's neck and failed to ask any follow-up questions concerning how Dr. Keen's lack of access to the removed neck organs impacted his conclusion of homicide. Similarly, Petitioner faults Engan for asking no questions of his own expert, Dr. Nelson, about the absence of signs of violent strangulation and for not asking Dr. Nelson questions which would allow him to elaborate on Dr. Keen's inability to examine the neck anatomy.[3]

_____

[3]The Court notes that Engan did, in fact, elicit testimony, albeit indirectly, from Dr. Nelson, concerning the condition of McLaughlin's neck. In response to Engan's question, "did you perform any tests to attempt to determine a window when the victim might have died?" Dr. Nelson answered: "We did an anterior neck incision and found very little trauma to the soft tissue of the neck. I took some skin incision over the area of the ligature and again they showed minimal what are called cellular abrasion to the red cells within the soft tissue

1    "Under Strickland, counsel's representation must be only objectively reasonable, not

2    flawless or to the highest degree of skill." Dows v. Wood, 211 F.3d 480, 487 (9th Cir. 2000).

3    This includes counsel's decisions during examination of witnesses.  As the Ninth Circuit has

4    explained, "counsel's tactical decisions at trial, such as refraining from cross-examining a

5    particular witness or from asking a particular line of questions, are given great deference and

6    must similarly meet only objectively reasonable standards." Id.   At first glance, Engan's

7    decision not place more emphasis on the condition of McLaughlin's neck appears

8    questionable, as one might expect the victim of a homicide by strangulation to exhibit signs

9    of neck trauma.  However, placed in its proper context and given the substantial deference

10   which it is due, the Court cannot conclude that Engan's performance was constitutionally

11   deficient.      Yarborough, 540 U.S. at 8 (noting the "particular force" the presumption of

12   effective assistance has in the face of a silent record).

13       The underlying assumption of Petitioner's argument is that the condition of

14   McLaughlin's neck supported a strong suicide theory.  The Court, however, is hesitate to

15   accept this proposition  The record shows that both medical examiners agreed that the cause

16   of McLaughlin's death was asphyxiation.  Their disagreement concerned the manner of her

17   death. Dr. Nelson was unable to make a definitive determination on this subject, finding that

18   McLaughlin's death could have been homicide, suicide, or accident.  (Answer, Exh. L2 at

19   125).  Dr. Keen, on the other hand, did conclude that McLaughlin's death was a homicide.

20   The discrepancy between the two expert's conclusions, however, was not predicated on the

21   condition of McLaughlin's neck.  Dr. Keen concluded McLaughlin's death was a homicide

22   based on the presence of various bruises on her body, and at testified at trial that because he

23   had been unable to view the neck organs removed by Dr. Nelson, he relied on Dr. Nelson's

24   conclusions concerning McLaughlin's neck when making his determinations.  (Id., Exh I at

25   89).  Additionally, the condition of McLaughlin's neck was not sufficient for Dr. Nelson,

26

27   _____

28   of the neck." (Answer, Exh. L2 at 116–17).  Engan did not, however, follow up on Dr.
     Nelson's answer.

1    Petitioner's own expert, to conclude that McLaughlin had committed suicide or to rule our
2    homicide as a possible manner of death.

3         Thus, while Petitioner now characterizes the condition of McLaughlin's neck as a
4    "critical issue,"it does not appear to have been a determinative factor for either medical
5    examiner that testified at trial.  The Court, therefore, is dubious of Petitioner's claim that
6    Engan overlooked a strong suicide defense.  Instead, it appears that Petitioner, based on Dr.
7    Peter's testimony, has ascribed a special significance to the condition of the neck that was
8    not apparent to either expert trial witness. Requiring Engan to have effectuated a strategy
9    based on such hindsight analysis runs counter to the cannons of ineffectiveness law.  See
10   Strickland, 466 U.S. at 689 (stating that courts must avoid engaging in hindsight analysis).

11        Relatedly, while the Court agrees with Petitioner that it was necessary for Engan to
12   undermine Dr.  Keen's conclusion of homicide, it cannot find, as Petitioner suggests, that
13   emphasizing the condition of McLaughlin's neck was a necessary component of any
14   objectively reasonable strategy to do so.  To wit, by focusing his examinations of the medical
15   experts on the source of their disagreement concerning the manner of McLaughlin's
16   death—i.e. whether McLaughlin's body exhibited pre-death bruises or post-death
17   livor—Engan sought to undermine Dr.  Keen's finding of homicide.  He appears, then, to
18   have pursued a strategy focused on highlighting the undeterminable nature of the manner of
19   McLaughlin's death, as opposed to pushing a suicide theory based on the condition of the
20   neck.  This comports with the evidentiary hearing testimony of Petitioner's ex-wife, Janet
21   Ward, who explained that Engan decided early that he needed to "take the focus of any
22   suicide scenario."  (Id., Exh.  Y at 99).  While this is clearly not the strategy that Petitioner's
23   current counsel would have pursued, the Court is unprepared to find that it was completely
24   unreasonable. Engan did seek to undermine Dr. Keen's conclusion of homicide, and contrary
25   to Petitioner's current position, the importance of the condition of McLaughlin's neck was
26   not so apparent or obvious as to make Plaintiff's decision not to emphasize it objectively
27   unreasonable.   Ultimately, while it might have been prudent to highlight the pristine
28   condition of McLaughlin's neck *and* attempt to discredit Dr.  Keen's conclusions concerning

1    the bruising, Engan's performance "cannot be deemed ineffective because, with the benefit

2    of hindsight, we now determine that other trial strategies . . . may have been a better choice."

3    Turner v. Calderon, 281 F.3d 851, 876 (9th Cir. 2002). Having determined that Engan did

4    not perform unreasonably, the court does not need to consider prejudice.

5

6                    **D**.    **IAC: Failure to Call a Second Defense Medical Expert to Testify**

7          Petitioner argues that Engan performed ineffectively by failing to call a second

     defense medical expert to support the "indeterminate" manner of death conclusion reached

8    by Dr. Nelson. Engan's decision not to do so, Petitioner alleges, was unreasonable because

9    a second expert would have added weight to the conclusions of Dr. Nelson, who was a less

10   experienced medical examiner than was the prosecutions expert, Dr. Keen. The Court must

11   reject this claim.

12         It is not uncommon for the respective experts of the prosecution and a defendant to

13   reach different conclusions and offer conflicting testimony, as was the case here. In all such

14   situations, it might potentially be helpful for the defendant to call a second expert witness to

15   testify as to the same facts as his first expert witness, thereby bolstering or lending credence

16   to the first expert's testimony. What would be helpful and what is constitutionally required,

17   however, are two very different things. To the extent that Petitioner advances such an

18   argument, the Court must reject his theory that effective assistance of counsel requires that

19   trial counsel hire a second expert when the testimony of his first expert conflicts with the

20   prosecution's expert. Such a rule would be logistically impractical and improperly suggests

21   that veracity is necessarily related to the number of people that make a claim.

22         Assuming, however, that in some circumstances effective assistance of counsel might

23   require the hiring of a second expert, Petitioner has not met his burden of demonstrating that

24   Engan's failure to do so was unreasonable. "The choice of what type of expert to use is one

25   of trial strategy and deserves a heavy measure of deference." Turner, 281 F.3d at 876. The

26   record shows that Egan consulted with a second medical expert before trial, Dr. Peters, but

27   elected not call to him. (Answer, Exh. Y at 14). Engan's decision not to call Dr. Peters at

28

1    trial is entitled to significant deference, and Petitioner has not adduced reasons that persuade

2    this court it was an unreasonable one.  To the contrary, the crux of Petitioner's claim is that

3    Dr. Peters would have testified more or less identically to Dr. Nelson.  While it is easy for

4    Petitioner to speculate about the possible benefits of such testimony—such as adding weight

5    to Dr.  Nelson's findings— it is possible Engan concluded that any such benefit was

6    outweighed by the potential negatives.  Engan may have decided, for example, that calling

7    a second expert would have suggested to the jury that he did not have faith in his expert or

8    that duplicative testimony would be confusing.  In light of the significant deference owed to

9    Engan's decision, the Court cannot find he performed unreasonably merely by deciding

10    against presenting duplicative or overlapping expert testimony, and the state court did not err

11    by rejecting this claim.

12              **E**.    **IAC: Failure to Show a Second Expert the Crime Scene Photos**

13              Relatedly, Petitioner argues that Engan performed unreasonably by failing merely to

14    show photographs of the crime scene to a second medical examiner or crime scene expert.

15    Specifically, he states that "if Engan had simply shown the crime scene photos to a medical

16    examiner or crime scene expert from the outset, he would have learned that suicide or in the

17    alternative, accident after an auto-erotic asphyxiation, based on a victim's body position, is

18    very common," and which would have supported a suicide claim.  In support of his position,

19    Petitioner notes the PCR evidentiary hearing testimony of Dr.  Peters, who described how

20    someone could hang himself without their feet ever leaving the ground, and testified that the

21    physical evidence supported such a scenario better than it did the homicide theory posited

22    by the prosecution.  (See Answer, Exh.  Y at 11–50 ).

23              As the Court has mentioned, the record shows that Engan did, in fact, consult with Dr.

24    Peters about the possibility of conducting a third autopsy of McLaughlin's body, but elected

25    not do so after Dr.  Peters told him that a third autopsy would not have been likely to provide

26    any new information. (Answer, Exh.  Y at 14).   As the state court that considered this claim

27    explained, "[w]ith the benefit of hindsight one can argue that Mr.  Engan should have gone

28    one step further an asked Dr.  Peters [or another expert] whether reviewing the record and

asking him to render an opinion based thereon, as to doing another autopsy, might yield something productive." (Petition, Exh. B at 8). Like the state court, however, this Court is unable to find that Engan's failure to take this additional step constituted ineffective assistance of counsel.

Engan already had the benefit of one medical expert, Dr. Nelson, who testified on direct and cross-examination that he viewed the crime scene photographs before conducting his autopsy. (Answer, Exh. L2 at 121, 141). Petitioner's argument, then, implies that it was objectively unreasonable for Engan to have trusted Dr. Nelson's conclusions, despite the fact those conclusions were based on the same evidence, including the crime scene photos, to which a second expert would likely have had access. Petitioner, however, has not explained why Engan should have had such mistrust, and instead improperly relies on the benefit of hindsight in the form of Dr. Peter's testimony. In other words, because Dr. Peter's review of the same crime scene photographs and autopsy information caused him to conclude that the position of McLaughlin's body was consistent with a hanging during which the victim's feet do not leave the ground, Petitioner argues that Engan should have known not to trust Dr. Nelson's analysis, which apparently did not include such a finding, and sought out a second opinion.

The Supreme Court has been very clear with respect to hindsight analysis. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Petitioner has not explained why from Engan's perspective at the time it would have been unreasonable not to have a second expert double check his own expert's conclusions. To the contrary, in other arguments presented to this Court, Petitioner has suggested Engan performed unreasonably for not hiring a second expert to corroborate Dr. Nelson's conclusions regarding the indeterminate nature of McLaughlin's death, which works against their instant position regarding the quality of Dr. Nelson's work. Accordingly, this Court, like the state court before it, can hardly find that Engan performed

1  unreasonably by not showing photographs of the crime scene to a second medical examiner

2  or crime scene expert.

3  **V.    PETITIONER'S DUE PROCESS CLAIMS**

4        Petitioner also argues that violations of his constitutional right to due process of law

5  warrant a new trial.  Specifically, Plaintiff alleges that the state violated his due process

6  rights when: (1) Detective Spoerry failed to record an interview he conducted with Bryce

7  McLaughlin, depriving Petitioner of potentially relevant evidence; and (2) the prosecutor,

8  Matthew J.  Smith, made improper remarks during his closing argument, rendering

9  Petitioner's trial fundamentally unfair.  In his R&R, Magistrate Judge Aspey concluded that

10  neither of Petitioner's due-process allegations warrants relief, as the Arizona Court of

11  Appeals findings with respect to these claims were not unreasonable applications of

12  controlling federal law.  Petitioner has only objected to Magistrate Aspey's findings with

13  respect to his prosecutorial misconduct claim.

14        **A.    Failure to Preserve Relevant Evidence**

15        In his habeas petition, Petitioner argued that the state violated his due process rights

16  when Detective Spoerry failed to record an interview he conducted with Bryce McLaughlin.

17  In his R&R, Magistrate Judge Aspey recommended that this claim be denied, explaining that

18  while "bad faith failure to preserve or to collect potentially exculpatory evidence is a

19  violation of the defendant's right to due process of law, there is no United States Supreme

20  Court opinion holding that the prosecution's bad faith failure to create potential impeachment

21  evidence." (Doc. 24, p.66).  Petitioner has not objected to the R&R's conclusions of law or

22  fact (on this claim), and his decision not to do so was prudent, as this Court agrees with

23  Magistrate Judge Aspey's analysis.

24        In <u>Arizona v.  Youngblood</u>, the Supreme Court held that failure to preserve

25  "potentially useful evidence," along with a showing of bad faith, could constitute a due

26  process violation. 488 U.S. 51, 57–58 (1988).  Subsequently, the Ninth Circuit has extended

27  <u>Youngblood</u>, holding that due process also requires a state to collect potentially useful

28  evidence, not merely preserve evidence that is already in its possession.  <u>Miller v. Vasquez,</u>

868 F.2d 1116, 1121 (9th Cir. 1989).  Petitioner's claim, however, does not allege that Detective Spoerry  failed  to preserve or collect evidence about which he already knew. Instead, as Magistrate Judge Aspey so artfully explained, Petitioner has accused Detective Spoerry of failing to *create* evidence, something neither <u>Miller</u> nor <u>Youngblood</u> appear to dictate.

In <u>Miller</u>, for example, the investigating officer learned that the victim possessed a jacket with the perpetrator's blood on it.  <u>Id.</u>  After interviewing the victim, the officer failed to take the jacket from her. <u>Id.</u> Shortly after this interview, the victim washed the jacket, destroying its evidentiary value. <u>Id.</u> Accordingly, the officer in <u>Miller</u> was aware of specific, pre-existing evidence that might be useful, but failed to collect it.  This case is not analogous to <u>Miller</u>, as Petitioner has not alleged that Detective Spoerry failed to collect evidence that predated the interview with Bryce McLaughlin and which he knew might be potentially exculpatory.  Instead, he has alleged that Detective Spoerry failed to record an interview at which such evidence might have been produced.    The Court, therefore, agrees with Magistrate Judge Aspey that petitioner is not entitled to relief based on this due process claim.[4]

**B.    The Prosecutor's Comments During Closing Arguments**

Finally, Petitioner alleges that three remarks made by Smith during his rebuttal-closing argument violated his due process rights.  In support of this claim, Petitioner points to three comments in particular: (1) "I believe Mr. Engan does not have any interest in looking at the truth"; (2) "What Mr. Engan wants you to do in this case is to go back into that

---

[4]Additionally, even if Detective Spoerry's conduct could be described as a failure to collect exculpatory evidence, <u>Miller</u> is Ninth Circuit precedent and is not, therefore, clearly established federal law.  As a result, this Court could not conclude that the State Court of Appeals, which rejected Petitioner's on the grounds that the state did not fail to preserve an material evidence, was contrary to or unreasonable application of federal law, as the relevant Supreme Court precedent—<u>Youngblood</u>—only requires the preservation of potentially relevant evidence.  Additionally there are no allegations that Spoerry or anybody else destroyed any evidence.

1    jury room and look at this case as a series of isolated events, a series of coincidences, things

2    that aren't that important, things that may be slightly more important. That's a favorite

3    Defense type of strategy"; and (3) "Anybody here think that I or Bob Spoerry or the police

4    department don't have things better to do than just say gee, I think that I will prosecute Sean

5    Patrick Ward today. You think that we don't have better things to do with your time."

6    (Answer, Exh. P, 65–66, 100).  Engan did not object to these statements during trial.

7        When a petitioner does not allege a specific deprivation of a provision of the Bill of

8    Rights, such as the right to counsel or the privilege against self-incrimination, "the

9    appropriate standard of review for such a claim on writ of habeas corpus is the narrow one

10   of due process, and not the broad exercise of supervisory power." Darden v. Wainwright,

11   477 U.S. 168, 181 (U.S. 1986) (internal quotations omitted).  Accordingly, in addressing

12   Petitioner's claim of prosecutorial misconduct during closing argument, "the relevant

13   question is whether the prosecutors' comments so infected the trial with unfairness as to make

14   the resulting conviction a denial of due process." Id. (internal quotations omitted).  This

15   standard reflects the reality that "the touchstone of due process analysis in cases of alleged

16   prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."

17   Smith v. Phillips, 455 U.S. 209, 219 (1982).

18       The state trial court found that only two of the alleged improper statements were, in

19   fact, improper.  This Court agrees.  Smith's  statement, "What Mr. Engan wants you to do

20   in this case is to go back into that jury room and look at this case as a series of isolated

21   events, a series of coincidences, things that aren't that important, things that may be slightly

22   more important. That's a favorite Defense type of strategy," was not improper, as it was

23   nothing more than a comment on a tactic, which is fair territory for a closing argument.

24   United States v. Sayetsitty, 107 F.3d 1405, 1409 (9th Cir. 1997)  ("Criticism of defense

25   theories and tactics is a proper subject of closing argument."); United States v.Catlett, 97

26   F.3d 565, 572 (D.C. Cir. 1996) ("In this case, the prosecutor was within his rights to suggest

27   to the jury that the arguments raised in defense counsel's summation were merely diversions.

28   Such an argument is not misconduct.")  The other two comments, however, were improper.

1    It is well established that a prosecutor may neither vouch for his own credibility, nor

2 the credibility of a witness.  United States v. Sanchez, 176 F.3d 1214, 1224 (9th Cir. 1999)

3 (stating that prosecutor may not implicitly vouch for a witness's credibility); United States

4 v. Smith, 962 F.2d 923, 933-34 (9th Cir. 1992) (explaining that a prosecutor may not vouch

5 for his or her own credibility).   "The rule against vouching . . . [is] designed to prevent

6 prosecutors from taking advantage of the natural tendency of jury members to believe in the

7 honesty of lawyers in general, and government attorneys in particular, and to preclude the

8 blurring of the fundamental distinctions between advocates and witnesses."  United States

9 v. Hermanek, 289 F.3d 1076, 1099 (9th Cir. 2002)(internal quotations omitted).

10    Smith's statement, "Anybody here think that I or Bob Spoerry or the police

11 department don't have things better to do than just say gee, I think that I will prosecute Sean

12 Patrick Ward today. You think that we don't have better things to do with your time?"

13 crossed the line from aggressive advocacy into impermissible vouching.   First, by stating

14 that both he and the police department had better things to do than prosecute Petitioner,

15 Smith implied special knowledge of Petitioner's guilt.  He may have well as said that  he did

16 not prosecute people, unless he knew they were guilty.  Second, this statement improperly

17 suggests that the testimony of a key state witness, Detective Spoerry, was credible, as it

18 implied that Spoerry likewise would not testify unless he was sure of Petitioner's guilt.

19    Smith also committed misconduct when he stated, "I believe Mr. Engan does not have

20 any interest in looking at the truth."  The Ninth Circuit has found that a prosecutor commits

21 misconduct when he denigrates the defense as a sham. United States v. Sanchez, 176 F.3d

22 1214, 1225 (9th Cir. 1999) ("The prosecutor committed misconduct in vouching for his

23 witnesses, denigrating the defense as a sham, and arguing that it was the jury's duty to find

24 the defendants guilty.").  By stating that Engan had no interest in looking at the truth, Smith

25 clearly implied that the defense presented by Engan was dishonest or willfully blind to the

26 truth; in other words, a sham.  Conversely, this remark also suggests that the prosecutor,

27 unlike Engan, had a special interest in looking at the truth, thus bolstering his own credibility.

28 The Court, therefore, must find that Smith's statement was improper.

1    Having found that Smith made two improper statements during his closing arguments,

2    the Court must determine whether those statements rendered Petitioner's trial fundamentally

3    unfair.  Given this stringent standard, "it is not enough that the prosecutors' remarks were

4    undesirable or even universally condemned."    Id.  (internal quotations omitted).  Instead,

5    a court must attempt to place the prosecutor's remark in its proper context.  Williams v. Borg,

6    139 F.3d 737, 745 (9th Cir. 1998) (citing United States v. Robinson, 485 U.S. 25, 33 (1988)).

7    This means considering the "probable effect the prosecutor's [comments] would have on the

8    jury's ability to judge the evidence fairly," taking into account such factors as whether the

9    prosecutor's remarks were an invited reply or response to comments made by the defense

10   attorney, United States v. Young, 470 U.S. 1, 13 (U.S. 1985), and the overall strength of the

11   prosecution's case.   United States v. Roberts, 618 F.2d 530, 535 (9th Cir. 1980).

12   Respondents argue that Smith's comments were invited and, as a result, did not render

13   Petitioner's trial fundamentally unfair.  In support of this position, they point to comments

14   made by Engan during his closing that allegedly challenged the integrity of the prosecutor,

15   the police, and Detective Spoerry.  For instance, Respondents note that Engan repeatedly

16   accused Smith of having coached Bryce McLaughlin concerning his testimony, pointing to

17   the following statements from Engan's closing:

18   > What about the things Bryce did up here. . . . Remember I asked him, ever see
19   > this man [Deputy County Attorney Smith] here before? What's his name?
     > Matt. How many times have you seen Matt before? Two times? Five times?
20   > Matt he teach me. Do you think that Mr. Smith might have gone over with
     > Bryce a few times, what it was Bryce was going to do, what he was going to
     > say. Do you think so? Matt he teach me. You bet he did.
21
22   > The State has, again, no physical evidence at all—at all linking Sean to this
     > scene. The State has Bryce McLaughlin who had been led throughout. Led by
23   > Mr. Smith. Been coached on what to say. Led by bias (sic) interrogators. Said
     > things, changed what he said. He is not reliable.
24
25   (Answer, Exh. P at 52, 63–64).  Additionally, Respondents claim that Engan challenged the

26   integrity of the investigating officers, including Detective Spoerry, by accusing them of being

27   disinterested in following other leads once Bryce had accused Petitioner of killing his

28   mother, when he said:

> They simply heard from Bryce McLaughlin daddy did it as reported to them from the Advocacy Center. That's when they lost their focus. More particularly, that's when they found their focus. Their focus on [Petitioner]. Any other evidence we don't care. We got what we want. Is that fair?

(Id. at 13).   Finally, Respondents also assert that Engan attacked the police and the prosecution's character by of accusing them of engaging in evidence shopping.

"If the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments [do] not warrant reversing a conviction." Young, 470 U.S. 12–13.  The Court finds Engan's statements invited some kind of response, but it cannot find that they invited the specific comments made by Smith.  In other words, Smith's remarks did more than right the scale, they tipped it in the prosecution's direction.  First, although Engan accused Smith of coaching Bryce, this accusation was not unprovoked, but instead was predicated on Bryce's testimony, "Matt he teach me."  It was not, then, a generalized attack on Smith's integrity, inviting a generalized response in return.  Instead, Engan's comments warranted a response to the specific allegation—witness coaching. Smith's statements, however, are not directly responsive to Engan's assertion of coaching. Instead, they are an attack on Engan's truthfulness and generalized vouching for the prosecution's overall case, which seem especially unwarranted given that Engan based his accusation on the testimony of the prosecutions own witness; testimony which a reasonable person could conclude was tantamount to an admission of coaching.

As for Engan's suggestion that the police stopped following leads once Bryce identified Petitioner, the Court agrees that it called into question the integrity of the police, inviting a response.  Smith's statement that the he and the police had better things to do than prosecute Petitioner (if he was not guilty), is somewhat responsive to that allegation.  Smith's comment concerning Engan's inability to look at the truth, however, is not.  The principle of invited response permits a prosecutor to respond to inappropriate remarks by a defense attorney.   It is not, however, a license for a prosecutor to make his own unrelated inappropriate comment.  Smith's questioning of Engan's willingness to look at the truth was not responsive to Engan's comment that the police stopped following leads once Bryce

1   identified Petitioner.

2        In sum, the Court finds that the invited response doctrine somewhat mitigates Smith's

3   "better things to do" statement, but does little to excuse his contention that Engan had no

4   interest in looking at the truth.  Any remaining prejudicial impact stemming from Smith's

5   "better things to do" statement was undermined by Engan's own closing remarks.  During

6   his closing arguments, Engan stated:

7            Mr. Smith [the prosecutor] here seems to be a pretty smart guy. He seems to
             be pretty sure that the Defendant is guilty and you heard from a series of police
8            officers all of whom testified for the State and they think he is guilty so maybe
             you should think that too. They probably know more about this case than I do.
9            They have lived with this case almost a year.

10  This comment vouches for the intelligence of the prosecutor and the police, placing their

11  level of knowledge above Engan's own.  Also, Engan's strange sarcastic endorsement allows

12  a juror to infer the prosecution's truthfulness, as it would be odd indeed to lavish such praise

13  on persons one thinks have been untruthful.  Accordingly, this statement severely undercuts

14  any prejudicial effect that might have been caused by Smith's statement that he and the

15  police and Detective Spoerry had better things to do than unfairly prosecute Engan.

16       This leaves only Smith's  statement concerning Engan's disinclination to look at the

17  truth as a basis on which this Court could find that Petitioner's trial was fundamentally

18  unfair.   In making this determination, the Court must consider the strength of the

19  Prosecutions case, which it finds was not strong.  The two medical examiners that conducted

20  an autopsy on McLaughlin did not agree on the cause of death, one concluding the cause was

21  unknown, the other that it was homicide; there was no physical evidence linking Petitioner

22  to the crime; the sole eyewitness was McLaughlin's developmentally disabled four-year old

23  son; Petitioner put on an alibi defense; and one of McLaughlin's children died three weeks

24  before her death, causing her to become very depressed.  Additionally, the state relied on

25  great deal of circumstantial evidence, some of which appears to be have been of questionable

26  relevancy, especially the fact that McLaughlin was killed with a rope Petitioner made and

27  on ceiling hooks he installed, Petitioner's propensity of using ropes and ceiling hooks during

28  sex with McLaughlin, and evidence demonstrating that Petitioner took his video-cameras,

1  drawings of nude women tied up with rope, and homemade pornographic videos from
2  McLaughlin's house on the night of the murder.  In short, the evidence of Petitioner's guilt
3  was far from overwhelming.

4        Given the closeness of this case, the Court cannot merely dismiss the possibility that
5  Smith's suggestion that Engan did not want to look at the truth affected the fairness of his
6  trial.  If after hearing all the evidence, a juror was conflicted about Petitioner's guilt, which
7  seems likely given the weakness of the prosecution's case, Smith's implication that he, an
8  agent of the government, had an interest in the truth, whereas Petitioner's lawyer did not,
9  may have been enough to sway the verdict.  It may have caused the jurors to view all of the
10 evidence through a different light, attributing credibility to the state's witnesses and
11 evidence, while discrediting or giving less credence to Engan's evidence and argument.

12       That being said, this error is not so prejudicial that reasonable jurists could not
13 disagree about its impact on the fundamental fairness of the trial.  The analysis required is
14 one fraught with subjectivity, as a court must do its best to determine in light of all the
15 circumstances whether the improper conduct rendered the trial unfair. The Arizona Court of
16 Appeals, having considered this same issue, found that Smith's comments, although
17 inappropriate, did not make Petitioner's trial fundamentally unfair. (Id., Exh. V at 19).  This
18 decision, as Magistrate Judge Aspey found, is not an unreasonable application of federal law.
19 This Court agrees.  Although very troublesome, it too is unprepared to say that Smith's single
20 comment was so prejudicial that the Arizona Court of Appeals decision that it did not affect
21 the fundamental fairness of Petitioner's trial was an unreasonable application of federal law.
22 See Williams v. Taylor, 529 U.S. 362, 411 (U.S. 2000).  Consequently, despite this Court's
23 concerns about Smith's comment, it cannot grant Petitioner's claim for relief.

24 **VI.    CONCLUSION**

25       Having reviewed all of Petitioners' properly exhausted claims, the Court finds that
26 none merit relief.  Thus, while the Court does not adopt in full the reasoning in Magistrate
27 Judge Aspey's R&R, it agrees with his overall conclusions.

28       **Accordingly,**

1   **IT IS HEREBY ORDERED** adopting the conclusions of Magistrate Judge Mark

2   Aspey's Report and Recommendation.  (Doc. 24).

3   **IT IS FURTHER ORDERED** denying Petitioner Sean Patrick Ward's Petition for

4   Writ of Habeas Corpus by a Person in State Custody Pursuant to 28 U.S.C. § 2254, (Doc.

5   1).

6   **IT IS FURTHER ORDERED** granting Petitioner a Certificate of Appealability and

7   leave to proceed in forma pauperis.  Petitioner has made a substantial showing of the denial

8   of a constitutional right with respect to the following issue(s): whether the prosecutor's

9   comments during closing arguments violated due process.

10   DATED this 30th day of September, 2010.

11

12

13   _____

14   Mary H. Murguia
     United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 34 -